(634 P.2d 133)

No. 50,891

Marshel Investments, Inc., *Appellant*, v. William C. Cohen, Sr., and Insurance Management Associates, Inc., *Appellees.*

Opinion filed August 28, 1981.

*C. Robert Bell,* of Wichita, for appellant.

*William Tinker,* of McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, for appellees.

Before Foth, C.J., Rees, J. and Harman, C.J. Retired, sitting by designation.

Rees, J.: This is an action brought against a firm of insurance agents or brokers and one of its members for failure to procure insurance. Jury trial resulted in a verdict in favor of plaintiff. Defendants' motion for judgment notwithstanding the verdict was sustained. Plaintiff appeals.

At all times material, plaintiff acted by and through its president and principal stockholder, Robert Gensch, a Wichita consulting petroleum geologist. Defendant Insurance Management Associates, Inc., also of Wichita, acted by and through defendant William C. Cohen, Sr. We will refer to the parties as Gensch and Cohen because it is from their conduct that the issues in this lawsuit stem.

Our review is circumscribed by the contents of the record on appeal. Because the appeal is from an order sustaining a motion for judgment notwithstanding the verdict, our view of the evidence must be in the light most favorable to Gensch. *Apperson v. Security State Bank,* 215 Kan. 724, 732-733, 528 P.2d 1211 (1974); *Fisher v. Sears, Roebuck & Co.,* 207 Kan. 493, 494-495, 485 P.2d 1309 (1971).

On about February 12, 1976, Gensch and another individual

acquired an oil and gas leasehold interest in and to a quarter-section of land in Barber County on which there was a well that was not then producing. The well's associated above-ground equipment was included in the purchase. Also on the land was a gas line belonging to Central States Gas Production Company, a natural gas producer and purchaser; it lay within about 35 feet of the well. Gensch assumed ownership of 91% of the leasehold interest and property acquired and the other individual held the remaining 9%. Gensch undertook to act as the operator of the lease.

Early in the following April, the well was connected to the Central States line. The well was tested into the line. Gas production began. Late in the evening of Monday, April 26, the well caught fire. There followed four days of continued, concerted activity. Gensch called Houston, Texas, for the advice and help of the renowned oil and gas well fire fighter Red Adair. Adair sent two of his men to the site. They arrived Tuesday afternoon. Oil field workers and a substantial quantity of equipment and materials were marshaled and put to work and use. Adair came to the site on Thursday. The fire was finally extinguished Friday afternoon.

The above-ground equipment associated with the well was destroyed; there was evidence its value was $15,000. The firefighting costs—for personal services furnished, equipment rental and materials used and consumed—were $35,732.02.

On about February 20, 1975, Gensch had contacted Cohen concerning procurement by Cohen of insurance for the lease. Gensch testified he telephoned Cohen. Cohen testified Gensch came to Cohen's office. At any rate, Gensch's direct examination testimony on what occurred was as follows:

"A. . . . I told him that I had an unusually large interest in this lease. I needed complete insurance coverage because of the . . . large interest that I did have, and that I could—I think the words that I used to him were 'ill afford to take a bath' in the event of a problem.

"Q. And what did he say?

"A. He said that various forms of insurance were available; and I said, 'Take care of me, Bill. I need complete coverage.'

"Q. Was there anything else said?

"A. I think at that time . . . he [bound] me on the insurance that he covered me with. He did ask me what kind of a well I had. I explained to him that this was a well that had been producing, that had been temporarily abandoned; that there was equipment on the well involving a pumping unit, pump unit

engine, various high-pressure surface fittings, various lead lines, two tank batteries, two stock tanks, a vertical heater treater, and a salt water collection tank; and . . . that I would operate the lease, but that the lease would be pumped by Central States Gas Producing Company, the company that was buying the gas. Since they were doing this up and down their line, it seemed to be a convenient way for me to go, and that I needed the coverage that would protect me with this type of operation. .

. . . .

"Q. Okay. Did you have any other conversations with him prior to April 26th other than what you've just told us?

"A. I recollect that he talked about workmen's comp-type of insurance. I didn't know whether I needed it. He said I did. Since the gas producing company had the people, I called them out there. They said they had adequate coverage for that type of thing. I remember talking to Bill about it. He said that I needed it anyway, and that was before April 26th.

"Q. All right. Any others?

"A. I can't think of anything else."

## On cross-examination Gensch testified:

"Q. Now, did you ever provide to Mr. Cohen or his agency any inventory of [the above-ground] equipment?

"A. To the best of my knowledge I did it by phone.

"Q. Did you tell him how much everything was worth?

"A. I don't believe that was asked of me, and I do not believe I mentioned the price. He wanted a description of the equipment. I couldn't give it to him. I sent a production superintendent out there to look at the equipment to describe it to me. He called me, and I reported that to Mr. Cohen.

"Q. . . . When did this conversation take place, the one you're just—

"A. When did this take place?

"Q. Yeah, yes.

"A. To my best recollection it was a response to a request of his when he first talked to me about it.

"Q. . . . in your discussions you say you had with Mr. Cohen—did [you] at any time . . . tell him how much you had invested in the whole property?

"A. No, sir. I did not.

"Q. Well, if it be true that at some point in time like you say now that you told him what was on the ground with the equipment, how did you think he was going to write you a fire insurance policy if he didn't know what it was worth?

"A. . . . As to the value of the surface equipment?

"Q. Yes. Well, yeah, what you say should have been insured.

"A. I don't remember how we would arrive at that—that price.

"Q. Well, as a matter of fact, you really never had any meaningful discussion— did you, Mr. Gensch? —with him about this property out there?

"A. I absolutely did.

"Q. . . . But you didn't tell him that; did you?

"A. I did tell him that. He asked me.

"Q. Did tell him what? How much it was worth? That's just what I asked you.
"A. No, sir. I did not tell him what it was worth.
"Q. All right.
"A. But I did describe the equipment to him because he asked me what I had.
"Q. . . . So there's no misunderstanding about this, you never talked to him, never told him what you claim that equipment was worth?
"A. I do not recollect that I did."

On redirect examination, he testified:

"Q. Did Mr. Cohen ever ask you what the equipment was worth?
"A. Not to my knowledge."

Cohen procured from the United States Fidelity and Guaranty Company (USF&G) two policies insuring Gensch. Cohen received the policies about April 10. He billed Gensch on April 13. Gensch paid Cohen by his check dated April 19. As shown by Cohen's invoices, one policy afforded comprehensive general and automobile liability coverages and the other afforded workmen's compensation and employer's liability coverages.

Cohen testified that on February 20 he telephoned USF&G and obtained its agreement to bind workmen's compensation and liability coverages as of that date. Accordingly, the policies were issued with coverage effective February 20, 1976.

We find nothing in the record on appeal to contradict our understanding that Cohen did not have underwriting authority and that he was not a general agent. He conducted his business as a so-called independent insurance agent. We assume he had agency agreements with USF&G and perhaps other insurers authorizing him to act as a soliciting agent and providing for commissions on premiums for business produced to be paid him by the insurer or insurers as compensation. He was required to submit to USF&G applications for the issuance of policies for his clients. Cohen had considerable experience and expertise in the business of insurance for individuals in the oil and gas business. He held himself out as having, and Gensch sought him out for, that experience and expertise. Gensch did not designate the insurer or insurers from whom coverages were to be procured. He did not specifically request physical damage coverage or control of well coverage. He either did not read the policies delivered or he did not receive them prior to the fire. He did not complain to Cohen prior to the fire that the coverages under the issued policies were not what or all he wanted.

Gensch claims Cohen is liable because he failed to procure

physical damage coverage for the above-ground equipment and "control of well" coverage. Physical damage coverage, referred to by Cohen as "leased property" coverage, would have provided for payment by the insurer to Gensch for the actual cash value of the above-ground equipment destroyed. There was no evidence of the cost of this coverage. Control of well coverage would have provided for payment by the insurer to Gensch for his incurred fire fighting costs. Under the evidence, control of well coverage would have been subject to a $25,000 deductible clause, that is, the insurer's payment obligation to the insured would have been for the payment of fire fighting costs in excess of $25,000. The annual premium for control of well coverage would have been $2,250.

At trial, Gensch sought to establish as a loss part of the value of the gas consumed by the fire; evidence of the value of gas consumed by the fire was not admitted. Gensch also testified he suffered a loss of future production, that is, reduced recoverable reserves, resulting from the procedures used to fight and extinguish the fire; there was no probative evidence of the value of this purported loss.

The jury was instructed:

"INSTRUCTION NO. 4

"If you find from the evidence that by reason of the conversations between [the] principals, Gensch and Cohen herein, the plaintiff selected Cohen and relied upon him to provide the insurance needed for the oil and gas operation in question, then you are instructed that it was the obligation of Cohen and his principal, Insurance Management Associates, Inc., to use such care and skill in the selection of coverage forms as would have been reasonably used by an ordinarily skilled insurance agent acting under similar circumstances in the city of Wichita, Kansas.

"Failure of the defendants to provide specific kinds of insurance would not render them liable for losses which might have been covered by such insurance unless that insurance would have been provided by a reasonably prudent insurance agent under the facts and circumstances shown to have existed in this case.

"INSTRUCTION NO. 5

"If you find that the defendants failed to provide a particular kind of insurance which should have been provided under the instructions heretofore given you, you are instructed that the plaintiff may recover from the defendants only so much as could have been recovered from appropriate insurance, less the premiums which would have been charged for that insurance. You are instructed that there is no evidence in this case that 'control of well' insurance could have been provided without a $25,000.00 deductible clause."

These are the only instructions made a part of the record on appeal by the parties.

Cohen moved for a directed verdict at the close of Gensch's evidence. The motion was overruled. He again moved for a directed verdict at the close of all the evidence; the motion was taken under advisement. See K.S.A. 60-250(*b*). The jury returned its verdict in favor of Gensch in the amount of $25,732.02. We and the parties construe the verdict to be for the loss of the above-ground equipment and the fire fighting costs, $50,732.02, less the deductible, $25,000. It is evident the jury, in accord with instruction No. 5, did not award damages for other loss. Following argument, the trial judge, on his own motion, reduced the verdict by $2,000, an amount he selected for the cost of insurance. He then set aside the reduced verdict of $23,732.02 and entered judgment in favor of Cohen as sought by the motion for a directed verdict made at the close of all the evidence.

The position taken by Cohen at the post-trial hearing was that there was no agreement between Gensch and Cohen sufficiently definite to create a duty to procure physical damage coverage for the above-ground equipment and control of well coverage. Cohen's argument was bottomed on *Mooney v. Merriam,* 77 Kan. 305, 94 Pac. 263 (1908). The trial judge expressed uncertainty as to the state of Kansas law applicable to the case and, when sustaining Cohen's motion, commented his decision was substantially a choice of which party would be the moving party on appeal. Needless to say, Gensch's first argument to us is that he should have been granted judgment on the jury verdict.

This case is not an action on a contract of insurance. It is not an action for failure to renew insurance. It is an action for failure to procure insurance.

The first and principal issue for determination is what duty, if any, did Cohen owe Gensch. If a duty is found, there then follows the question whether there was evidence sufficient to support the jury verdict for Gensch.

There is a large body of law on the subject of liability of insurance agents or brokers for failure to procure insurance. The annotations at 29 A.L.R.2d 171, 64 A.L.R.3d 398, 72 A.L.R.3d 704, and 72 A.L.R.3d 747 lead one to cases on the subject. Understandably, we are most concerned with the pronounced law of Kansas and we will recapitulate in generally chronological order the most relevant Kansas cases to date.

In *Latham v. Harrod*, 71 Kan. 565, 81 Pac. 214 (1905), the defendant insurance agents procured fire insurance coverage by an insolvent foreign insurer not authorized to do business in Kansas. The insured's goods were destroyed by fire. An action on the policy was unsuccessfully prosecuted against the insurer in the state of its domicile. The Kansas action against the insurance agents followed. The recovery sought was the amount of the policy. Relying upon statutory proscriptions, it was held the insurance agents could be held personally liable. Judgment for nominal damages was reversed and a new trial was ordered. The opinion resulting from a second appeal in the case, *Harrod v. Latham*, 77 Kan. 466, 95 Pac. 11 (1908), is not presently material. By the later opinion, a judgment for the insured for the amount of the policy entered on a directed verdict was reversed; the reason given was that even though the trial evidence was uncontradicted, it was for the jury to decide the case.

The decision most strenuously relied upon by Cohen is *Mooney v. Merriam*, 77 Kan. 305. We will discuss it later.

In *Rezac v. Zima*, 96 Kan. 752, 153 Pac. 500 (1915), it was alleged that upon the defendant insurance agents' solicitation and plaintiff's direction defendants agreed to procure insurance on plaintiff's barn which later burned. The plaintiff appealed from trial court refusal of his evidence. It was held that under the plaintiff's allegations "the agreement is an enforceable one and the defendants are responsible for the loss sustained through their neglect and wrong"; the case was remanded for trial. 96 Kan. at 756. It is said in the opinion:

"This action was not brought to recover upon a contract of insurance against the insurer, but is an action against the defendants for the failure to procure insurance on his property as they had undertaken to do, and for wrongfully representing that insurance had been procured when in fact it had not, as a result of which a considerable loss had been sustained. A broker or agent who undertakes to procure insurance for another is bound to exercise reasonable diligence to obtain insurance in accordance with his agreement and to notify his principal if he is unable to do so. According to the averments in the petition the defendants failed to perform this duty, and, as has been alleged, Zima deliberately deceived the plaintiff by giving him assurance that the property had been insured when he knew that no insurance had been procured. If defendants had informed plaintiff of the omission or failure he could have obtained insurance elsewhere and have provided against loss. It does not appear that a particular insurer was named, but it was agreed that insurance should be obtained in a responsible company. If defendants had failed to exercise reasonable care in the selection of an insurer and had placed the insurance with a company that was insolvent or one not authorized

to insure, and subsequently the property had been destroyed and the plaintiff had been unable to realize on the policy, the defendants would have been liable. (*Latham v. Harrod,* 71 Kan. 565, 81 Pac. 214; *Harrod v. Latham,* 77 Kan. 466, 95 Pac. 11.) Brokers are equally liable where they undertake to procure insurance and utterly neglect to obtain any insurance or fail to carry out material provisions of their agreement and a loss results. In such a case they are liable for as much as would have been covered by the insurance which they agreed to procure." 96 Kan. at 754-755.

In *Cushenberry v. Grecian,* 112 Kan. 778, 779, 212 Pac. 681 (1923), an action against an insurance agent for failure to procure insurance on a house that was later destroyed by fire, it was held:

"The policy of insurance was to have been for $400. When the property burned that was the amount the plaintiff was entitled to receive."

Even though interest was recoverable under the instruction held not erroneous, the case is not authority for the proposition that more may be recovered than what would have been owed under the insurance not procured. There is no mention of interest either in the opinion or the appellate briefs; the proposition cannot be considered to be a question decided.

In *Smith v. Hartford Fire Ins. Co.,* 120 Kan. 53, 242 Pac. 455 (1926), there is language alluding to the possible liability of the insurer's agent if an agreement to procure insurance had been made. The case is not of present precedential value because it was an action brought against an insurer on an alleged agreement to insure; whether there was an actionable claim for failure to procure insurance was not an issue decided.

In *Rosedale Securities Co. v. Home Ins. Co.,* 120 Kan. 415, 243 Pac. 1023 (1926), the action was against an insurer on an auto theft policy. Involved was the question whether the client for whom a broker procured the policy was bound by knowledge of a policy condition that was or should have been known to the broker. The opinion approves the definition of a broker as one who is engaged in the business of procuring insurance for persons applying to him for that service. 120 Kan. at 419. It also is authority for the proposition that an insurance broker is the agent of his client, the insured, in matters connected with the procurement of insurance but he is usually regarded as an agent of the insurer for the purpose of collecting and remitting the premium and delivering the policy. 120 Kan. at 418.

*Price, Administrator v. Holmes,* 198 Kan. 100, 422 P.2d 976 (1967), holds nonrepugnant causes of action in contract and in

tort arising out of the same transaction may be prosecuted in a single lawsuit. 198 Kan. at 103-104.

In *Stamps v. Consolidated Underwriters,* 205 Kan. 187, 197, 468 P.2d 84 (1970), an action for reformation of an insurance policy, it is stated:

"Ordinarily a broker or agent who is employed to procure insurance becomes the agent of the person for whom the insurance is procured. (43 Am. Jur. 2d, Insurance, § 149, p. 203; *Rosedale Securities Co. v. Home Ins. Co.,* 120 Kan. 415, 243 Pac. 1023)

"There are many exceptions to the rule, however, and the question cannot be answered absolutely, but depends upon the circumstances of the particular case. For some purposes and under certain circumstances, a broker may represent either the insured or insurer, or both. (43 Am. Jur. 2d, Insurance, § 149, p. 203)"

*Keith v. Schiefen-Stockham Insurance Agency, Inc.,* 209 Kan. 537, 498 P.2d 265 (1972), is a failure to procure insurance case in which it was held the petition stated a claim upon which relief could be granted. Plaintiffs sought recovery against an insurance agency for its failure to procure workmen's compensation insurance and to cause an election to be filed. Plaintiffs prosecuted the action as third party beneficiaries of agreements between their decedents' employer and the insurance agency. In the opinion it is noted a plaintiff has a right to plead alternate tort and contract causes of action arising out of a single transaction. 209 Kan. at 539-540. Also in the opinion is the following:

"This court follows what appears to be the general rule that a broker or agent who undertakes to procure insurance for another and thereafter the broker neglects or fails to do so, he will be held liable for any damage resulting therefrom. The liability of the agent or broker in such a case rests on the theory that he is the agent for the insured in negotiating for a policy and has a duty to exercise reasonable care, skill and diligence in effecting the insurance, and may be sued for breach of contract or negligent default in the performance of a duty imposed by contract. (43 Am. Jur. 2d, Insurance, § 174, pp. 230-231.)" 209 Kan. at 540-541.

The opinion says the Kansas law in regard to an action against an insurance broker was enunciated in *Rezac v. Zima,* 96 Kan. at 752, and sets forth the *Rezac* language we have previously quoted. 209 Kan. at 541.

The most recent relevant case is *Marker v. Preferred Fire Ins. Co.,* 211 Kan. 427, 506 P.2d 1163 (1973), an action against an insurance company and one of its agents for loss resulting from tornado damage to real property. Insurance coverage lapsed on the expiration of a policy term and plaintiff's problems arose because there was no renewal. In the opinion we find it said:

"The thrust of plaintiff's argument [that the agent is liable because he breached a contractual obligation to notify plaintiff of the expiration date of the lapsed policy] is that if an insurance agent promises his client that he will notify him at the time a policy expires and fails to do so, then the agent is responsible to the client for any loss suffered. In support of this position plaintiff relies upon the well-established principle of law that an insurance agent or broker who undertakes to procure insurance for another and thereafter neglects or fails to do so, will be held liable for any damage resulting therefrom. There are a number of cases in Kansas which support this general rule. [Citations omitted.] For many cases from other jurisdictions see the extensive annotation in 29 A.L.R.2d 171.

"The theory of liability in such cases is based upon contractual obligations arising out of the relationship of broker and insured. In determining the obligations of a broker to the insured the general rules pertaining to the law of contracts should be applied including the cardinal rule that a binding contract can not come into existence unless there is a consideration for the same.

"Where a broker is employed to procure insurance for a client, the decisions recognize the necessity of a consideration for the broker's promise in order for the broker to be bound thereby. Where there is no consideration passing to an insurance broker for his undertaking to procure insurance it is generally held that there is no liability for a failure to accomplish such procurement. The consideration which flows to the broker in return for his promise to procure insurance is said to be the expectation of the broker of receiving a commission or profit when the insurance policy is obtained. The agreement by the proposed insured to pay the premium and accept a delivered policy is a real and not just a technical consideration in exchange for the promise to procure insurance." 211 Kan. at 431-432.

"In every case where an insurance agent has been held liable for failure to procure insurance or renew a policy or give notice of the expiration date of an existing policy, the relationship of broker and client has been established with mutual obligations arising from that relationship." 211 Kan. at 433.

In that part of *Marker* now of interest, the conclusion reached was that under the facts the relationship of broker and client never existed and the agent was not liable on a theory of contract. 211 Kan. at 433, 434.

The remaining Kansas opinion for consideration is *Mooney v. Merriam*, 77 Kan. 305. There, an action was brought against a firm of insurance agents. The opinion opens with a statement that the action was for breach of an "agreement to write an insurance policy." 77 Kan. at 305. In affirming a trial court ruling that sustained a demurrer to the plaintiff's evidence, it was held the evidence was not sufficiently definite to establish that an agreement was made—the evidence was deficient in failing to show with reasonable certainty the terms and conditions of the alleged agreement. 77 Kan. at 307. While we do not question the general

rule that to prove the existence of an agreement there must be evidence of reasonable definiteness that there was a meeting of the parties' minds upon subject matter and terms, we believe the importance of *Mooney* in resolution of the case before us is not so great as that urged by Cohen.

We are convinced the *Mooney* court did not address the case as one for failure to procure insurance. *Latham v. Harrod,* 71 Kan. 565, is not mentioned. Each case cited as authority concerns an action brought on a contract of insurance or an equivalent, a contract for insurance or to insure. Contracts of insurance and their equivalents are agreements between an insured and an insurer. An agreement to procure insurance is an agreement between a client and an insurance agent or broker.

That *Mooney* was considered as one involving a contract to insure is demonstrated by the statements that:

"According to the evidence the defendants are not brokers of insurance, but agents representing certain insurance companies. The law will not permit them to represent both the insurance company and the insured in the same transaction. Plaintiffs concede this to be the law  . . . .

"Counsel for plaintiffs concede that the law is well settled that one who agrees as agent of a certain insurance company to write a policy acts for the company, and may make his principal liable for his neglect or failure, but does not become liable himself. The reason for the rule is  . . .  that if he acts as agent of the company he cannot act as agent of the assured in the same transaction." 77 Kan. at 309.

Further, the decision describes the indefinite and uncertain terms—"subject matter of the policy, the risk insured against, the duration of the risk, the amount of the insurance, and the premium to be paid." 77 Kan. at 310. These are the typical specifics of a contract of insurance, an insurance policy.

We are aware the authors of the annotations appearing at 29 A.L.R.2d 171, 180, and 64 A.L.R.3d 398, 456, and perhaps others, have categorized *Mooney* as an agreement to procure insurance case. Nevertheless, we believe it is the author of the annotation appearing at 15 A.L.R. 995, 1005, who is correct; he treats *Mooney* as a contract of insurance case.

Consideration of the previously quoted language of *Mooney* discloses another reason for distinguishing that case from the one before us. The proposition that an insurance agent may never act as a dual agent in a transaction is no longer an absolute rule. *Rosedale Securities Co.,* 120 Kan. at 418; *Stamps,* 205 Kan. at 197.

In *Rezac,* one of the failure to procure insurance cases reviewed and which, according to *Keith,* enounces our law in such cases, *Mooney* was distinguished, not on the ground that it was a contract to insure case, but instead by finding that Rezac's agreement was sufficiently definite and comprehensive. In doing so, the *Rezac* court said it was to be deemed that the duration of the risk and the premium terms were contemplated by the parties to be according to "well-known standards." This permitted incorporation of "well-known standards" as implied terms of Rezac's agreement. 96 Kan. at 755-756. We believe the *Rezac* court could have adequately distinguished *Mooney* simply by identifying it as what it is, a contract to insure case, not a failure to procure insurance case.

From the decisions discussed, we conclude an insurance agent or broker who undertakes to procure insurance for another owes to the client the duty to exercise the skill, care and diligence that would be exercised by a reasonably prudent and competent insurance agent or broker acting under the same circumstances. We will refer to this as the exercise care duty.

It has been explicitly stated an action for the breach of this duty may be brought in contract or in tort. Although no Kansas cases reveal particular exposition of legal analysis for the ability to bring the action on these alternative theories, it might be said the duty is both an implied contractual term of the undertaking (contract duty) and a part of the fiduciary duty owed the client by reason of the principal-agent relationship arising out of the undertaking (tort duty). Despite all too familiar usage of the term "negligent breach of contract," if there is a breach of contract, there is a breach of contract whether because of intentional conduct, inability to perform, accident, negligence, or whatever. It is inappropriate to denominate the available contract cause of action as one for negligent breach of contract.

In the case before us, we perceive no need to identify or require Gensch to declare or elect that his chosen cause of action is in contract or in tort. There is no statute of limitations problem and there is no demonstration that under the evidence Gensch's recoverable damages would be measured differently if sought on one theory rather than the other.

Cohen contends he is not liable as a matter of law. He repeats to us his argument that met with success before the trial judge. It

uses *Mooney* as its touchstone. It is that an undertaking to procure insurance requires and is a matter of agreement, the existence of which must be proved by evidence of reasonable definiteness that there was a meeting of minds upon subject matter and terms as well as evidence of consideration. It is urged that Gensch's statements or request was nothing more than "take care of me, Bill. I need complete coverage. I can ill afford to take a bath." Cohen argues Gensch's testimony is fatally indefinite proof of a meeting of the minds. Needless to say, the characterization of Gensch's version of the parties' conversation is somewhat extreme. We are unable to accept Cohen's argument.

Our previous rather extensive discussion of reasons for distinguishing *Mooney* will not be repeated. Reasonable implication may be utilized to prove the subject matter, terms and consideration for an agreement to procure insurance. In *Rezac,* it was deemed that within the contemplation of the parties at the time of their agreement were the "well-known standards" of term of insurance and premium amount. 96 Kan. at 755-56. As *Mooney* observed less strict proof of the agreement may be tolerated for agreements to renew insurance because they frequently are oral (77 Kan. at 310), we similarly believe less strict proof is required for an oral agreement to procure insurance than for a contract of insurance. After all, in cases such as this, the terms of the contract of insurance and its cost are within the field of expertise of the agent or broker and it is for this expertise that the agent or broker is sought out. Cohen did not find himself unable to proceed without a more complete and detailed understanding.

By instruction No. 4, the existence of the exercise care duty required the jury find nothing more than that Gensch selected and relied upon Cohen. No objection in compliance with K.S.A. 60-251(*b*) was made to the instruction. It strikes us there is some inconsistency to not lodge objection to the instruction and then to argue to the trial judge after trial and to us that greater definiteness was required.

As to consideration, one who requests or directs an insurance agent or broker to procure insurance must be deemed to obligate himself—promise—to pay the reasonable cost of the insurance to be procured. This and the agent or broker's expectation of compensation fulfills the requirement for agreed compensation. However the February 20 and possibly later conversations may

be described, it cannot be denied Cohen undertook procurement of insurance for Gensch—he procured insurance affording Gensch liability and workmen's compensation coverages. Cohen cannot seriously argue he acted without the expectation of compensation either by direct payment from the client, Gensch, or by commission upon the obtaining of insurance policies. Having been paid by Gensch for the premiums for the insurance procured, the argument is particularly unrealistic. There was consideration for his undertaking.

Contrary to argument made to us by Cohen on the question of dual agency, an insurance agent or broker who undertakes to procure insurance ordinarily is the agent of the client in matters connected with the procurement of the insurance; he may act as the agent of the insurer for other purposes; he may represent either the client or the insurer, or both.

In sum, we are unable to conclude that as a matter of law Cohen did not owe the exercise care duty.

Assuming the existence of the duty, there remains the question whether the evidence supports a conclusion the duty was breached. Cohen argues the expert testimony at trial requires the conclusion there was no breach.

Two Wichita insurance agents or brokers testified on Cohen's behalf. Each testified he had never sold control of well coverage for a Kansas oil and gas well. Control of well coverage is in demand, has a market elsewhere, *e.g.,* Texas, where wells are deeper. One of the witnesses was directly questioned whether he normally recommended control of well coverage. The trial transcript reflects the inquiry and response as follows:

"Q. Mr. Harrison, in your handling of things in the insurance business, when we're talking about Kansas lease and existing well, do you normally recommend this 'control of well' coverage to people?

"A. It's difficult—Maybe it's a difficult thing to answer. I probably—Let me say this: I have never had anybody that I've talked to ever take it in Kansas. Whether I would—might discuss with them or—I just don't know at the moment what would be the answer to that because it's—it's just an unusual coverage that we don't have any market for in Kansas and—at least it hasn't been so in our office.

"Q. Yeah, thank you.

"A. Maybe we're not up on it."

Cohen testified he did not remember telling Gensch control of well coverage was not available in Kansas; he does not recom-

mend it to clients; it was neither recommended nor even mentioned to Gensch; its cost and deductible feature make it "not economically feasible"; "[w]e have quoted it on several occasions. Nobody ever buys it. In fact, I don't know of one policy written exclusively on Kansas operations"; the coverage is "written" through specialty companies.

Gensch had testified that after the fire and in connection with his rework of the well, he inquired of Cohen as to what type of insurance he should acquire in the event a similar incident occurred. He was told control of well-type coverage was not available. Nevertheless, he subsequently obtained control of well coverage for the well, first under a certificate of insurance obtained from Houston, Texas, and later under a policy obtained through a local firm.

Viewing the evidence most favorably to Gensch and recognizing the jury was entitled both to believe or disbelieve witnesses as they chose and to draw reasonable inferences from the evidence, we are unable to conclude the evidence demands the conclusion Cohen did not breach his exercise care duty. The question was for resolution by the jury.

We conclude the trial judge erred when he set aside the reduced jury verdict and entered judgment for Cohen.

As his second issue on appeal, Gensch complains the trial judge erred in giving instruction No. 5. The argument is the jury was erroneously prohibited from including loss of production as a part of its verdict. According to Gensch, the jury should have been afforded the latitude to return a verdict compensating him for (1) the value of gas consumed by the fire which would not have been lost had insurance been available to defray the cost of a method of extinguishing the fire that would have taken less time; and (2) the value of the loss of future production from the well, reduction of recoverable reserves, said to have been caused by the fire extinction method used, a method assertedly required because the nonexistence of control of well coverage made it financially impossible to use a more expensive method that would have had no or less effect upon future production.

As to the claim for the first of these damages elements, there was no supporting evidence. Gensch's testimony that $50,000 worth of gas was consumed by the fire was stricken by the trial judge; it was hearsay; it was testimonial recitation of an out-of-

court declaration by Red Adair who was not present at trial and available for cross-examination. See K.S.A. 60-460. No argument is made to us that the trial judge erred in striking the testimony and there is not a shred of evidence the fire could have been more promptly extinguished.

As to the claim for the second of these damages elements, there was no sufficient supporting evidence. Counsel tried to qualify Gensch as a witness competent to testify regarding future production. The trial judge ruled Gensch was not qualified. We agree with the ruling; Gensch conceded his field of expertise to be that of oil and gas geology and not oil and gas engineering. See K.S.A. 60-456(b). Further, it is not argued on appeal that the ruling of the trial judge was erroneous.

On the evidence in the record, a control of well policy excludes responsibility for payment for "loss of production." Because of the failure of the evidence to support either of the two elements of Gensch's loss of production claim, it is not necessary that we decide whether the exclusion would apply to both damages elements, or if only one, which one.

Complaint that the trial judge erred in reducing the jury verdict by $2,000 is asserted by Gensch as his third issue on appeal. We agree the trial judge erred. However, the error is in the amount of the reduction; it does not lie in the fact the trial judge made a reduction. The jury did not heed that part of instruction No. 5 directing the subtraction of insurance cost. Instructing the jury that they make that subtraction was not objected to by Gensch. See K.S.A. 60-251(b).

Had Cohen procured control of well coverage, the annual premium would have been $2,250; the effective date would have been February 20, 1976; and as of the date of the fire, April 26, 1976, there would have been earned premium for 67 days. We conclude the proper amount of reduction was $411.89 (annual premium ÷ 366 days x 67).

The decision of the trial judge sustaining defendants' motion for judgment notwithstanding the verdict is reversed. The case is remanded with directions to enter judgment in favor of plaintiff in the amount of $25,320.13.