(130 P.3d 1201)

No. 92,790

MANUEL FERNANDO CASAS, *Appellant/Cross-appellee,* v. FARMERS INSURANCE EXCHANGE, *Defendant,* and MARTY ROBBINS INSURANCE AGENCY, INC., *Appellee/Cross-appellant.*

Opinion filed October 28, 2005.

*Robert R. Laing, Jr.*, of Overland Park, for appellant/cross-appellee.

*Randolph G. Willis* and *John L. Kellogg*, of Rasmussen, Willis, Dickey & Moore, L.L.C., of Kansas City, Missouri, for appellee/cross-appellant.

Before GREEN, P.J., JOHNSON, J., and LARSON, S.J.

GREEN, J.: The plaintiff, Manuel Fernando Casas, sued the defendant, Marty Robbins Insurance Agency, Inc., (Agency) for failure to procure a homeowner's insurance policy. A jury trial resulted in a verdict in favor of the Agency. Casas brought his action against the Agency based upon both a contract and a tort theory. The Agency moved for dismissal of Casas' negligence claim on grounds that Casas neglected to produce expert testimony to establish that Robbins had breached his duty of care as an insurance agent. The trial court granted this motion. In addition, the Agency sought dismissal of Casas' contract claim on grounds that Casas failed to establish an oral contract to procure insurance. The trial court denied this motion.

Casas appeals the trial court's granting of the Agency's motion to dismiss his negligence claim. The Agency cross-appeals the trial court's denial of its motion to dismiss Casas' oral contract claim. We conclude that the trial court properly dismissed Casas' negligence claim. We further determine that the trial court erred in failing to grant the Agency's motion to dismiss Casas' oral contract claim. Accordingly, we affirm in part and reverse in part.

In August 2003, Casas sued insurance agent Marty Robbins and Farmers Insurance Exchange (Farmers) after his home was destroyed by a tornado and Farmers denied homeowner's insurance coverage. Casas and Farmers later reached a settlement, and Far-

mers was dismissed from the case with prejudice. Casas' tort and contract actions against Robbins proceeded to a jury trial.

According to Casas' testimony at trial, Casas telephoned Robbins, who was an independent agent with Farmers, in May 2002 and told him that he needed homeowner's insurance coverage. At the time, Casas had both car insurance and renter's insurance with Farmers. Casas had originally obtained car insurance in 1997 or 1998 with a different agent through Farmers. Nevertheless, Casas had been assigned to Robbins in early 1999 when Casas' previous agent stopped working for Farmers.

When Casas called Robbins in May 2002, he reported that his van had been stolen and recovered and that there was some damage to it. Casas testified that he also told Robbins that he was purchasing a new home. Casas further testified that he gave Robbins the price of the home and the address and told him that he needed coverage for it. According to Casas, Robbins told him that "he was going to take care of it." Casas indicated that Robbins' statement made him believe that Robbins was going to get him the proper insurance coverage for the house.

Casas admitted that he did not discuss with Robbins the date that he was moving; the construction of the house; the style of the house; the square footage; the number of bedrooms, bathrooms, or fireplaces; the amount financed; the financing arrangement; the loss-payee, if any, that should be listed on the policy; the policy period; the premium amount; or the deductible. Casas further admitted that he did not discuss with Robbins whether there was going to be coverage for contents, for additional living expenses, for debris removal, or for cleanup. Casas indicated that he did not sign an application for insurance coverage in May 2002 or ever receive anything in writing regarding a homeowner's policy on the house in question.

During Robbins' testimony, he indicated that it is necessary to know most of the above information before a homeowner's policy is written. Robbins further indicated that he did not have the authority to issue a homeowner's policy without this information. Moreover, Robbins indicated that it was not permissible for him

to promise or issue a homeowner's policy if the application has not been signed by the customer and the premium has not been paid.

Robbins' version of the May 2002 telephone conversation differed significantly from that given by Casas. Although Robbins agreed that Casas called and reported the damage to his van, he denied that Casas said that he was buying a new home and that he needed homeowner's insurance. According to Robbins, Casas was upset that his van had been stolen for the second time in 6 months and indicated that he wanted to move into a safer neighborhood. Nevertheless, Casas did not give him any specific information concerning his intention to move. Robbins indicated that Casas just made a general statement that he wanted to get into a better neighborhood but did not indicate that he was definitely moving. Robbins' computerized notes, which were taken at the time of the May 2002 conversation, were consistent with Robbins' testimony. These notes failed to indicate that Casas told Robbins that he was buying a home, that he wanted Robbins to procure homeowner's insurance, or that Robbins offered to issue homeowner's insurance.

On May 13, 2002, several days after Casas' phone conversation with Robbins, Casas purchased the house located at 2401 North 102nd Street in Kansas City, Kansas, through a contract for deed. The purchase price of the house was $135,000. Reid Roberts was the owner and builder of the house. Casas agreed to make monthly payments to Roberts and to refinance the home within 24 months so that the remaining balance could be paid in full. Casas moved into the house on May 14, 2002.

According to Robbins, his computerized notes reflect that he again spoke with Casas in August 2002. Robbins also had handwritten notes from this phone conversation. At that time, Casas added an auto policy with Robbins' agency and also added his wife to the coverage. In addition, Casas notified Robbins that his address had changed to 2401 North 102nd Street. Robbins indicated that this was the first time that Casas had notified him about the change of address. Robbins further indicated that it was the Agency's standard practice to ask if there were any other changes that the insured would like to make to the policy other than the address change and that Casas responded that there were not.

Casas' home was destroyed by a tornado on May 4, 2003. The next day, Casas called the Agency to report the loss. According to Casas, he spoke with someone other than Robbins and was told that Robbins would call him back. When Robbins called back later that day, Casas was standing on the concrete foundation of his destroyed home and received the call on his cellular phone. Casas testified that Roberts, who owned the house next door and had been talking with Casas about the damage, was next to him when Robbins called. Casas put the call on speakerphone. According to Casas, Robbins told him that there was a problem with the insurance. Robbins advised Casas that he only had renter's insurance and not homeowner's insurance. Casas testified that Robbins admitted that he remembered Casas calling him the prior year and telling him that Casas was buying a new house. Nevertheless, Robbins indicated that he never made the change on Casas' policy. Robbins told Casas that he was going to call Farmers' main office and see what he could do to take care of it.

Roberts corroborated Casas' testimony regarding the May 2003 telephone conversation. Roberts indicated that he was beside Casas when Robbins called, that Casas put the call on speakerphone, and that he was able to hear the entire conversation. According to Roberts, Robbins said that he remembered Casas previously calling and saying that he was buying a new home. Nevertheless, Robbins said that he never got Casas' policy changed from renter's insurance. Robbins indicated that he was going to call the home office and see what needed to be done.

At trial, Robbins denied telling Casas during the May 2003 phone conversation that he had discussed homeowner's insurance with him in May 2002. Robbins further denied telling Casas that he remembered Casas stating that he was going to buy a house. According to Robbins, during the May 2003 conversation, Casas wanted to know the amount of coverage on his policy. Robbins told Casas that he had $20,000 coverage for personal property plus coverage for additional living expenses. Casas then wanted to know the amount of coverage on the house. Robbins told Casas that he did not have coverage on the house and that he had a renter's policy because someone else owned the house. Casas informed Robbins

that he had bought the house the previous year. Casas told Robbins: "You and I had a conversation about that last May, that I was moving into a safer neighborhood." At that point, Robbins went back and looked through his computer notes and read them to Casas. These notes failed to indicate that Casas had mentioned a homeowner's policy.

According to Robbins, he asked Casas if he ever received a homeowner's policy from Robbins or from Farmers, if he received evidence of insurance or a binder of insurance, if anything was ever mailed to his mortgage company, if Casas ever made any payments that could help Robbins track down the policy. Casas responded that he had not. Robbins then asked Casas: "How was I to know that you needed homeowner's coverage if you didn't report these things?" Casas stated: "That is your job."

At trial, the Agency introduced reproductions of several Farmers documents that purportedly had been sent to Casas. These included declarations pages covering the periods from May 1, 2002, to May 1, 2003; from August 9, 2002, to May 1, 2003; and from May 1, 2003, to May 1, 2004; and a March 10, 2003, offer of renewal of renter's insurance. The trial court admitted these documents over Casas' objections. Casas admitted that he had received several documents from Farmers between the time of the May 2002 phone conversation with Robbins and the day after the tornado. Although Casas could not recall the specific documents he received, he did not deny receiving the declarations pages and renewal notice. Moreover, Casas indicated that he probably received the Farmers declarations pages. The Agency also introduced an invitation sent out from its office inviting customers to go over their insurance coverage. Robbins indicated that Casas would have received an invitation each year. Although Casas indicated that he did not remember when he received the invitations, he testified that he remembered seeing things like it.

When Casas was cross-examined about the declarations page covering the May 1, 2002, to May 1, 2003, period, he indicated that a statement in the upper left-hand corner of the page revealed that it was a broad form renter's policy. Moreover, the page listed "coverage for the property, the dwelling, or mobile home" as "not

covered." On redirect examination, Casas testified that the declarations page contained the word "Homeowners" beneath the word "Declarations" in the top right-hand corner. Casas indicated that he continued to pay his premiums throughout the spring and summer of 2003.

In his suit, Casas raised contract and negligence claims against Robinson. At the May 2004 trial, the trial court signed an amended pretrial order where Casas agreed to amend the pleadings to substitute the Agency as the defendant in the case. In addition, the amended pretrial order which was agreed to by the parties set forth Casas' claims as follows: (1) that Robbins "was negligent in not procuring the proper insurance which [Casas] had requested from Defendant Marty Robbins and which Marty Robbins said he would procure for [Casas] and which Defendant Robbins should have known was necessary;" and (2) that Robbins "breached the contract to procure insurance for [Casas] by not actually procuring the insurance with Farmers Insurance Company which was needed for Mr. Casas' newly purchased home." Casas sought damages of $172,000 from Robbins.

Within the amended pretrial order, the Agency also set forth his legal theories as to why Casas was not entitled to relief on his claims. The Agency maintained that Casas did not have an insurable interest in the property at the time of the May 2, 2002, phone conversation. In addition, the Agency asserted that no oral contract to procure insurance existed because Robbins never made any statements indicating that he would procure homeowner's insurance for Casas. The Agency maintained that Casas never requested that Robbins procure homeowner's insurance for him. Moreover, the Agency asserted that Casas should have been aware that he only had a renter's policy because he had been sent an offer to renew the renter's policy. The Agency contended that Casas' failure to review or object to this offer of renewal estopped Casas from claiming that he had a homeowner's policy.

At the close of Casas' evidence at trial, the Agency filed six motions requesting judgment as a matter of law on Casas' claims. The trial court heard arguments from each of the parties on these motions. In ruling on these motions, the trial court stated:

"[F]rankly, Counsel, I just haven't had—I don't haven't had the time and don't have the time now to look deeply into these cases that are cited. I'm going to decide these the best I can." The trial court granted the Agency's motions for judgment as a matter of law on Casas' negligence claim and claim for collateral damages. The trial court also granted the Agency's motion for judgment as a matter of law requesting that Casas be required to elect between his inconsistent theories of recovery, that is, his breach of oral contract claim and his negligence claim. Moreover, the trial court denied the Agency's motion for judgment as a matter of law on Casas' breach of oral contract claim and the Agency's estoppel defense. The trial court also denied the Agency's motion for judgment as a matter of law in which the Agency argued that Casas did not have an insurable interest in the house. The case was ultimately submitted to the jury, which rendered a verdict in favor of the Agency.

First, Casas argues that the trial court erred in granting judgment as a matter of law on his negligence claim due to the absence of expert testimony. K.S.A. 2004 Supp. 60-250(a)(1) governs when the trial court may grant judgment as a matter of law on a claim or defense raised by a party:

"If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue."

Under a previous version of 60-250, the legislature used the term "directed verdict" instead of "judgment as a matter of law." See K.S.A. 60-250(a) (Furse 1994). In reviewing the trial court's decision granting or denying judgment as a matter of law, we apply the former directed verdict standard of review. *White v. Tomasic*, 31 Kan. App. 2d 597, 600, 69 P.3d 208 (2003).

" 'When ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought. Where reasonable minds could reach different conclusions based on the evidence, the motion must be denied. A similar analysis must be applied by an appellate court when reviewing the grant

or denial of a motion for directed verdict.' [Citation omitted.]" *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 202, 4 P.3d 1149 (2000).

The Agency argued before the trial court that its motion for judgment as a matter of law on Casas' negligence claim should be granted because there was an absence of evidence that Robbins breached the standard of care for a reasonably prudent insurance agent. The Agency pointed out that Casas had made an untimely attempt to endorse an expert witness. The trial court sustained the Agency's motion for judgment as a matter of law on the negligence claim.

Nevertheless, Casas argues that expert testimony was not necessary in this case to establish that Robbins was negligent in failing to procure a homeowner's insurance policy. Casas maintains that the common knowledge exception applies in this case.

Casas cites to *Bi-State Dev. Co., Inc. v. Shafer, Kline & Warren, Inc.*, 26 Kan App. 2d 515, 990 P.2d 159 (1999), where this court discussed the common knowledge exception. There, the court recognized that in order to maintain an action for negligence, the plaintiff needed to show a duty, breach of that duty, injury resulting from the breach, and that the breach proximately caused the injury. 26 Kan. App. 2d at 517. The court noted that in cases involving professional actions and whether the professional deviated from the standard of care, expert testimony is often necessary to establish the standard of care. Nevertheless, the court recognized that the common knowledge exception applies "when a lay person's common knowledge is sufficient to recognize a deviation from the accepted standard of care." 26 Kan. App. 2d at 518.

In *Marshel Investments, Inc. v. Cohen*, 6 Kan. App. 2d 672, Syl. ¶ 1, 634 P.2d 133 (1981), this court set forth the standard of care that applies to an insurance agent who undertakes to procure insurance for another: "An insurance agent or broker who undertakes to procure insurance for another owes to the client the duty to exercise the skill, care and diligence that would be exercised by a reasonably prudent and competent insurance agent or broker acting under the same circumstances." The court referred to this standard of care as the "exercise care duty." 6 Kan. App. 2d at 683.

Based on the language in *Marshel*, in order for Casas to establish an action for negligence in tort based on Robbins' failure to procure insurance, he would need to show what "a reasonably prudent and competent insurance agent or broker acting under the same circumstances" would have done and that Robbins breached this "exercise care duty." 6 Kan. App. 2d at 683.

The question is whether the jury, using its common knowledge, would recognize a deviation from the "exercise care duty" in this case or whether expert testimony was necessary. Neither Casas nor the Agency cite to any case within this jurisdiction that has addressed the issue of whether, or under what circumstances, the negligence of an insurance agent must be established by expert testimony. In Annot., *Necessity of Expert Testimony to Show Standard of Care in Negligence Action Against Insurance Agent or Broker*, 52 A.L.R.4th 1232, 1234, it was stated:

> "Whether expert testimony is required to establish the standard of care applicable to insurance agents who are charged with negligence depends to a large extent on the nature of the alleged negligent act. While no court has suggested that expert testimony is necessary where the agent's breach is so obvious that it is within the ordinary knowledge and experience of lay persons, several courts have taken the position that expert testimony as to the standard of care is required where the breach involves the agent's professional skills and expertise.
>
> "No clear standard has evolved for determining whether a particular negligent act sufficiently involves an agent's professional skills so as to require the use of expert testimony."

Therefore, it appears that whether expert testimony is required to establish an insurance agent's standard of care really turns on the facts of each case as to whether the breach involves the agent's professional skills and expertise.

Casas cites to *DiMarino v. Wishkin*, 195 N.J. Super. 390, 479 A.2d 444 (1984), and *Consolidated Sun Ray, Inc. v. Lea*, 401 F.2d 650 (3d Cir. 1968), *cert. denied* 393 U.S. 1050 (1969), to support his position that expert testimony was not required to establish his negligence claim. In addressing the third-party defendant broker's argument that there was an absence of expert testimony, the *DiMarino* court stated that expert testimony is not required to show the culpability of an insurance broker when there has been

a failure by that broker to meet the minimum established standard of care. In that case, there was a failure by the broker who undertook to procure a replacement policy for the third-party plaintiff to obtain requested coverage. *DeMarino* is distinguishable from the instant case, however, as the facts of *DiMarino* indicate that the broker had previously written insurance for the third-party plaintiff and that the third-party plaintiff was merely requesting a replacement policy. *Consolidated Sun Ray, Inc.*, is also distinguishable from the instant case. There, expert testimony was found to be unnecessary to show the standard of care where the insurance broker had explicit directions from its insured to procure a specific type of insurance and to name a particular corporation as an insured but failed to do so.

Research of case law from other jurisdictions does not reveal a factual situation like the present case. As indicated above, the question of whether expert testimony is required to establish an insurance agent's standard of care in a negligence action turns on the facts of the particular case and whether the agent's professional skills and expertise are involved in the breach. See Annot., 52 A.L.R.4th 1232.

Under the facts of this case, Casas needed to show what a reasonably prudent and competent insurance agent would have done with the information allegedly provided by Casas during the May 2002 phone conversation. For instance, would a reasonably prudent and competent agent have understood that the information obtained during the phone conversation created a duty to obtain homeowner's coverage? Was there enough information provided to go out and procure a homeowner's policy? Would a reasonable and prudent agent need to get back with Casas and get additional information? All of these questions come within the "exercise care duty" and it is clear expert testimony is necessary to establish this standard of care.

Nevertheless, in arguing that the common knowledge exception applies here, Casas maintains that the alleged negligence issue in this case is very simple: Did Robbins procure or obtain the homeowner's insurance which Casas requested and Robbins acknowledged he would procure? At trial, however, Casas indicated that

his negligence theory involved whether Robbins, based upon his background, should have asked further questions that would have enabled him to procure the insurance. Specifically, Casas stated the following regarding his negligence claim:

"[A]s you heard Mr. Robbins testify, he's got an excellent background in this area, and he should have known what to do for my client. He should have known the questions to ask. When Mr. Casas said he was moving to a new house, he should have known that he needed to ask another question there, which would have led him to another series of questions which would have got this job done."

These statements indicate Casas' negligence claim relied on Robbins' expertise as an insurance agent to ask further questions and to procure the homeowner's insurance.

Like *DiMarino* and *Consolidated Sun Ray, Inc., Marshel* is both instructive and distinguishable from this case. In *Marshel,* the applicant wanted "control of well" insurance coverage. Evidence was presented that control of well coverage was "unusual." 6 Kan. App. 2d at 685. Expert testimony indicated that control of well coverage was generally obtained through specialty companies. 6 Kan. App. 2d at 685-86. Moreover, evidence showed that the control of well coverage would have been subject to a $25,000 deductible clause and that the annual premium would have been $2,250. As a result, the *Marshel* court stated that the "[insurance agent] did not find himself unable to proceed without a more complete and detailed understanding." 6 Kan. App. 2d at 684.

Unlike *Marshel,* no evidence was introduced as to what type of homeowner's insurance coverage should have been procured in this case. Moreover, no evidence was presented on what the deductible would have been or what the annual premium would have been. A lay juror would not necessarily know whether Robbins had been furnished with sufficient information to procure a homeowner's policy or whether Robbins was obligated to ask further questions.

The negligence elements of duty and breach in this case involved Robbins' professional skills and expertise as an insurance agent. To send the negligence issue to the jury without expert testimony to establish what a reasonably prudent and competent insurance agent would have done under the same circumstances and whether

Robbins had breached this standard of care would require the jurors to improperly engage in speculation on questions outside of their knowledge. The common every day knowledge of persons would not allow them to know the degree of skill, care, and diligence required of a reasonably prudent and competent insurance agent acting under the same circumstances. Casas had the burden to furnish the necessary expert testimony in this case to establish the duty and breach elements of his negligence claim. Because he failed to do so, the trial court properly granted judgment as a matter of law in favor of the Agency on Casas' negligence claim.

In its cross-appeal, the Agency argues that the trial court erred in denying it judgment as a matter of law on Casas' oral contract claim. The Agency contends that as a matter of law, Casas failed to present sufficient evidence which would allow a reasonable juror to find in his favor on his claim of breach of an oral contract to procure a homeowner's policy. This court's standard of review is set forth in the first issue raised by Casas in this case.

The question to be answered is whether, when resolving all facts and inferences reasonably to be drawn from the evidence in favor of Casas, a reasonable person could find that an oral contract to procure insurance was formed between Casas and Robbins and that Robbins breached the contract.

The Utah Supreme Court's decision in *Harris v. Albrecht*, 86 P.3d 728 (Utah 2004), is instructive on this issue. In *Harris*, Albrecht was an insurance agent employed by Rick Albrecht Insurance Agency, Inc., but sold insurance policies exclusively through State Farm Fire & Casualty Company (State Farm). Beginning in 1989, Harris obtained an automobile insurance policy through State Farm from Albrecht. Thereafter, Albrecht procured various insurance policies for Harris, including an umbrella policy, as well as coverage for his house, boat, and recreational vehicle. Most of the business between Harris and Albrecht was conducted through telephone conversations. Harris and Albrecht spoke by telephone every couple of months. Generally, Harris would request insurance coverage, and Albrecht would fulfill Harris' requests without detailed discussion of the different types of coverages.

Harris then contacted Albrecht in 1997 to obtain business insurance for his architectural firm. Harris directed Albrecht " 'to place business and fire coverage on [his] equipment and the contents [of his office.]' " 86 P.3d at 730. According to Harris, Albrecht responded that " 'he would take care of [it],' " and " 'he would come out and look at [the] equipment.' " 86 P.3d at 730. Several months later, a fire destroyed the building where Harris' architectural firm was located. Architectural plans and other valuable papers were lost in the fire. Harris called Albrecht and asked: " 'You placed that [business] coverage we talked about, didn't you?' " 86 P.3d at 730. Albrecht responded: " 'We talked about it Ken, but we never did anything about it.' " 86 P.3d at 730. Harris sued Albrecht, alleging breach of a contract to procure insurance and negligent failure to procure insurance. The trial court granted summary judgment in favor of Albrecht on these claims. The Utah Court of Appeals reversed the grant of summary judgment. Albrecht appealed this decision to the Utah Supreme Court.

In determining whether an oral contract to procure insurance existed between Albrecht and Harris, the Utah Supreme Court cited *Hamacher v. Tumy*, 222 Or. 341, 352 P.2d 493 (1960). The *Hamacher* court stated that in order to find an agent liable for failure to procure insurance, the agent must have sufficiently definite directions from his principal to allow him to consummate the insurance contract. Nevertheless, noting that an express agreement is unnecessary and that many of the elements needed for an insurance contract can be found by implication, the *Hamacher* court stated:

" 'In entering into a contract to procure insurance, obviously the owner is seeking the same ultimate objective, that is, a contract of insurance, but the performance for which he bargains is the services of the insurance agent in obtaining the best possible terms consistent with the owner's insurance needs. Such a contract could arise even though the agent was given the authority to ascertain some of the facts essential to the creation of the ultimate contract of insurance, such as the appraised value of the property to be covered or the most advantageous premium.'

" '. . . Obviously, liability for failure to procure insurance could not arise unless the agent had sufficiently definite directions from his principal to enable him to consummate the final insurance contract. . . . [A]n express agreement is not

necessary; the scope of the risk, the subject matter to be covered, the duration of the insurance, and other elements can be found by implication.' [222 Or. at 349-50]" 86 P.3d at 731.

After setting forth this language from *Hamacher*, the Utah Supreme Court in *Harris* reached the following conclusion:

"Therefore, a contract to procure insurance may arise when the agent has definite directions from the insured to consummate a final contract, when the scope, subject matter, duration, and other elements can be found by implication, and when the insured gives the agent authority to ascertain some of the essential facts." 86 P.3d at 731.

Applying this reasoning to the facts in *Harris*, the Utah Supreme Court determined that "Albrecht did not have sufficiently definite directions from Harris to consummate the final insurance contract." 86 P.3d at 731. The court reasoned that in order for Albrecht to procure the business insurance for Harris, he needed to know the type of coverage that Harris wanted, the value of the items insured, the deductible amount that Harris wanted, why the business had not been insured, the start date of the policy, and whether there had been any previous losses. The court noted that Albrecht did not have any of this information as all of Harris' previous policies were personal. In addition, the court stated: "Harris has not cited any instance where a court has held that an insurance agent must procure part of an insurance policy while waiting for the remaining sections to be sufficiently identified." 86 P.3d at 732.

Moreover, the *Harris* court noted that the scope of the risk, subject matter to be covered, duration of the coverage, and other elements could not be established by implication. Further, Harris had not given Albrecht the authority to ascertain some of the essential facts but had only made a blanket request for insurance. The *Harris* court also found that previous dealings between the parties did not supply by implication the missing terms of the contract. The court stated: "Prior dealings are supportive only to the degree that they supply essential elements from which the agent can complete an insurance contract. Harris' personal insurance policies provided no information from which Albrecht could have inferred the necessary and missing terms for a business policy." 86 P.3d at 732.

In concluding that Albrecht did not have sufficient information from which the terms of a contract of insurance or a contract to procure insurance could be implied, the *Harris* court stated:

"The expression of a desire to procure business insurance followed by an oral affirmation of that desire is not enough to create a contract to procure insurance. Creation of a contract to procure insurance requires that the agent know or have ready access to the information needed to procure the insurance or be able to imply the terms from prior dealings. If the insured gives authority to the agent to obtain some information, he must do so explicitly." 86 P.3d at 732.

Finding that no contract to procure insurance existed between the parties, the Utah Supreme Court reversed the Court of Appeals' decision reversing the trial court's grant of summary judgment in favor of Albrecht.

The instant case is factually similar to *Harris*. Here, as in *Harris*, there was very little information exchanged between Casas and Robbins during the telephone conversation in which an oral contract to procure insurance was allegedly formed. According to Casas, during the May 2002 conversation, he told Robbins that he was buying a new house, gave him the price and address of the house, and said that he needed coverage. Robbins responded that "he was going to take care of it." Nevertheless, no information was given concerning the type of homeowner's policy that Casas wanted (Robbins' testimony indicated that there were several types), the amount of deductible that Casas wanted, and the date that Casas wanted the insurance policy to go into effect. This information concerns the essential elements, that is, scope of the risk and duration of the insurance, needed to consummate the final contract of insurance. The record indicates that Robbins did not have any of this information because Casas' other policies were for car insurance and renter's insurance. Further, Casas never filled out an application for homeowner's insurance to provide this information.

Moreover, there is nothing in the record establishing that this information could be identified by implication. Casas never introduced a "standard" homeowner's insurance policy. There was not any evidence presented about what a standard deductible would be or what the standard terms are in a homeowner's insurance

policy. Moreover, Robbins did not provide any information about what a standard homeowner's insurance policy would cover. For instance, when Robbins was questioned about what coverages other than the structure would be included in a standard homeowner's policy, Robbins stated: "It's hard to know what to say [is] 'standard' simply because there's so many different variables that go into a policy." Moreover, Robbins indicated that there were several categories of information which were necessary to write a homeowner's policy and which Casas had not provided. Specifically, Robbins indicated that the following information was necessary: the date that a person is moving into a home; the construction of the house, which included the style of the home, type of siding, number of fireplaces, number of bedrooms and bathrooms, whether the basement was finished, and the square footage; the deductible; the loan amount; and the financing arrangement. Robbins indicated that once all that information was collected, a quote would be put together for the customer. Robbins further indicated that he would usually review the quote with several deductible options with the customer and talk about additional insurance that was needed. None of these things were discussed with Casas.

The evidence in this case fails to indicate that Robbins knew or had ready access to the information that was necessary to procure a contract for homeowner's insurance for Casas. The prior dealings between Casas and Robbins did not supply the essential elements from which Robbins could complete a homeowner's insurance contract. As set forth in *Harris*, "Prior dealings are supportive only to the degree that they supply essential elements from which the agent can complete an insurance contract." 86 P.3d at 732. Here, the prior dealings between Robbins and Casas related to the automobile insurance and renter's insurance policies. The record does not indicate, and Casas fails to allege, that there was anything in these policies from which Robbins could infer the necessary and missing information for the homeowner's insurance policy. As a result, the trial court should have granted judgment as a matter of law in favor of the Agency on Casas' breach of a contract to procure insurance claim.

Because we have determined that the Agency was entitled to judgment as a matter of law on Casas' negligence and contract claims, we need not address Casas' other contentions.

Affirmed in part and reversed in part.