**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 14, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

      Plaintiff Counter Defendant -
      Appellee,

v.

DENNIS WOOLMAN,

      Defendant Counter Plaintiff -
      Appellant,

and

CLAYTON SPENCER,

      Defendant.

No. 17-3249

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:14-CV-02332-CM)**
_____

Wesley J. Carrillo (Christopher M. Napolitano with him on the briefs), of Ensz & Jester
P.C., Kansas City, Missouri, for Defendant-Appellant.

Bruce A. Moothart (Charlie J. Harris, Jr., with him on the brief), of Seyferth Blumenthal
& Harris LLC, Kansas City, Missouri, for Plaintiff-Appellee.
_____

Before **TYMKOVICH**, Chief Judge, **HOLMES**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.

_____

The Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act (the Act), 30 U.S.C. §§ 901–945, requires coal-mine operators to provide benefits to miners whose contraction of pneumoconiosis—*i.e.*, "black lung" disease—from prolonged exposure to coal dust renders them totally disabled. To comply with the Act, coal-mine operators must purchase a worker's compensation and employer liability insurance policy containing an "endorsement" ensuring coverage for black-lung-benefits claims. In this appeal, Dennis Woolman—former president of The Clemens Coal Company—challenges the district court's determination that Liberty Mutual Fire Insurance Company didn't breach a duty to him by failing to procure for Clemens Coal an insurance policy with a black-lung-disease endorsement. Woolman also challenges the district court's rejection of his argument that Liberty Mutual should be estopped from denying black-lung-disease coverage, insisting that he relied on Liberty Mutual to provide such coverage. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**BACKGROUND**

Clemens Coal operated a surface coal mine in Pittsburg, Kansas until it filed for bankruptcy in 1997. Woolman served as Clemens Coal's last president before it went bankrupt. Federal law required Clemens Coal to maintain worker's compensation insurance with a special endorsement covering miners' black-lung-disease benefits. *See* 20 C.F.R. § 726.203(a). Failure to procure such insurance could

2

expose Clemens Coal's president and its officers to individual liability for black-lung benefits and for civil penalties. *Id.* § 726.302(c)(1)–(2).

Woolman didn't personally procure insurance for Clemens Coal but instead delegated that responsibility to James Worley, an outside consultant. In 1996, Worley received from Deborah Smith, Liberty Mutual's commercial sales agent, a proposal to provide worker's compensation and employer liability insurance to Clemens Coal. After some discussion, Worley agreed to purchase from Liberty Mutual a package policy with effective dates of November 1, 1996, to November 1, 1997.[1] Not only did the policy not contain a black-lung-claim endorsement, it expressly excluded coverage for federal occupational disease claims, such as those arising under the Act.

Smith had never sold insurance to a coal company and wasn't aware of the industry's exposure to black-lung claims. Worley, for his part, had never procured insurance directly from an insurance company. Instead, he ordinarily consulted a broker—Insurance Management Associates, Inc. (IMA)—and compared premiums and coverages from several potential carriers. In this case, he selected the Liberty Mutual policy because it was $43,000 cheaper than comparable policies offered through IMA. An IMA account representative cautioned that this significant price disparity suggested that the policy provided different coverages. Worley, however, assumed the Liberty Mutual policy was cheaper because it wasn't in the assigned risk pool for Kansas, which Worley understood to have considerably higher premiums.

---

[1] Although the policy was effective until November 1, 1997, it was cancelled on August 1, 1997, because of non-payment.

3

In 2012, Clayton Spencer—a former Clemens Coal employee—filed a claim with the United States Department of Labor (DOL) against Clemens Coal for benefits under the Act. After some investigation, the DOL advised Woolman that Clemens Coal was uninsured for black-lung-benefits claims as of July 25, 1997—the last date of Spencer's employment—and that, without such coverage, Woolman, as Clemens Coal's president, could be held personally liable. Woolman promptly tendered the claim to Liberty Mutual for a legal defense. Liberty Mutual responded with a reservation-of-rights letter, stating that it hadn't yet determined coverage for Spencer's claim but that it would provide a defense during its investigation. In a follow-up letter, Liberty Mutual clarified that it would defend Clemens Coal as a company—not Woolman personally—and advised Woolman to retain his own counsel.

Liberty Mutual eventually concluded that the insurance policy doesn't cover Spencer's black-lung claim, and on July 9, 2014, it sued Clemens Coal[2] and Woolman seeking a judicial declaration to that effect. The parties stipulated that the policy, "as written," doesn't provide coverage for Spencer's claim. Appellee's Suppl. App. vol. 1 at 15. Nevertheless, as an affirmative defense, Woolman asserted that Liberty Mutual is estopped from denying black-lung-claim coverage because he expected the coverage would be included in the policy and because the policy should

---

[2] The district court dismissed the claims against Clemens Coal before trial because Clemens Coal was bankrupt and thus no longer a legal entity capable of being sued.

be construed to contain the coverages that federal law requires. Woolman also asserted a counterclaim against Liberty Mutual for breach of its duty to act as a reasonably prudent insurance agent in procuring the proper coverage for Clemens Coal.

The district court conducted a jury trial on Woolman's counterclaim and a bench trial on his estoppel defenses. During the jury trial, the parties offered little direct evidence of the circumstances surrounding Worley and Smith's transaction to procure insurance. Indeed, neither Worley nor Smith recalled the transaction, and Woolman, who admittedly wasn't involved, had "no idea" what transpired. Appellant's App. vol. 5 at 828:3. Smith resorted to testifying that, when selling insurance, she ordinarily relied on the client to inform her of its required coverages. Yet neither Smith nor Worley recalled discussing a need for black-lung-claim coverage. And, while both Woolman and Worley testified that they intended to procure whatever coverages were required by law, they admitted that they didn't read the policy to verify that it included such coverages; instead, they just assumed it did.

Smith also testified that it was her "standard" practice to determine coverage needs by reviewing the client's expiring policy, though she regularly consulted other resources as many clients declined to share their prior policies. *Id.* vol. 4 at 585:1. Worley, in turn, testified that he would have permitted Smith to copy the coverages in Clemens Coal's expiring policy from Hartford Underwriters Insurance Company. Yet Smith didn't recall reviewing the Hartford policy, and Worley didn't recall sharing it. Regardless, the parties could only speculate as to the coverages that Smith

5

may have copied from the Hartford policy because it couldn't be located at trial.[3] Further, Liberty Mutual proffered evidence that, in a 1996 reservation-of-rights letter to Clemens Coal regarding a previous black-lung claim, Hartford questioned whether the policy covered such claims.

Lacking direct evidence of Worley and Smith's transaction, Woolman urged the jury to find that Liberty Mutual failed to exercise reasonable care in procuring insurance based on the following series of inferences: (i) that Worley intended to acquire, and therefore requested, black-lung-claim coverage; (ii) that Worley tendered the expiring Hartford policy for Smith to review; (iii) that the policy contained a black-lung-claim endorsement; and (iv) that Smith, following her "standard" practice, agreed to duplicate that coverage for Clemens Coal. *Id.* vol. 4 at 585:1. Liberty Mutual countered that there was insufficient evidence for these inferences, and at the close of Woolman's case-in-chief, it moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The district court took the motion under advisement and permitted additional briefing.

Woolman requested that the district court instruct the jury that his breach-of-duty counterclaim required proof (i) that Liberty Mutual undertook to procure worker's compensation insurance for Clemens Coal; (ii) that Liberty Mutual failed to exercise appropriate skill, care, and diligence in that undertaking; and (iii) that

---

[3] Only the policy's "Change in Information Page" was produced, and it didn't indicate whether the policy had a black-lung-claim endorsement. Appellee's Suppl. App. vol. 2 at 40.

6

Woolman suffered damages as a result. The court rejected Woolman's request and, instead, instructed the jury to determine whether Liberty Mutual breached a duty that it owed directly to Woolman as its "client." *Id.* vol. 2 at 225–26. Woolman objected and asked for an instruction that Liberty Mutual owed him a duty "as the President of Clemens Coal," but the court overruled the objection. *Id.* vol. 5 at 907:23.

The jury returned a verdict for Woolman on his counterclaim, awarding him $18,000 in damages. The district court, however, set aside the verdict and granted Liberty Mutual's motion for judgment as a matter of law, concluding that Liberty Mutual didn't owe a duty to Woolman. *Liberty Mut. Fire Ins. Co. v. Clemens Coal Co.*, 2016 WL 5817073, at *2 (D. Kan. Oct. 4, 2016). Months later, the court issued findings of fact and conclusions of law regarding Woolman's estoppel defenses. *See Liberty Mut. Fire Ins. Co. v. Clemens Coal Co.*, 250 F. Supp. 3d 825, 832–39 (D. Kan. 2017). Finding no evidence that Liberty Mutual had represented it would procure black-lung-claim coverage for Woolman or that Woolman justifiably relied on such representations, the court ruled against Woolman on the estoppel defenses and entered judgment in Liberty Mutual's favor on its declaratory judgment claim. *Id.* at 839.

Woolman filed a post-trial motion to alter or amend the court's judgment or, in the alternative, for a new trial on his estoppel defenses. The court denied the motion. Woolman timely appealed, challenging the counterclaim and estoppel rulings as well as aspects of the court's denial of his request for post-trial relief.

**DISCUSSION**

We first address Woolman's argument that the district court improperly granted Liberty Mutual's motion for judgment as a matter of law on his breach-of-duty counterclaim. We then turn to Woolman's argument that Liberty Mutual should be judicially estopped from contesting that it owed him a duty. Finally, we address Woolman's challenges to the district court's ruling on his equitable and promissory estoppel defenses.

## I. Woolman's Breach-of-Duty Counterclaim

We review de novo a grant of judgment as a matter of law under Rule 50, applying the same standards as the district court. *Elm Ridge Expl. Co., LLC v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013). "All reasonable inferences are drawn in favor of the nonmoving party and this court does 'not make credibility determinations or weigh the evidence.'" *Stewart v. Adolph Coors Co.*, 217 F.3d 1285, 1288 (10th Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Judgment as a matter of law is appropriate only if a "reasonable jury would not have a legally sufficient evidentiary basis" to find for the opposing party. Fed. R. Civ. P. 50(a)(1); *see also Finley v. United States*, 82 F.3d 966, 968 (10th Cir. 1996) ("[T]he evidence [must] point[] but one way and [be] susceptible to no reasonable inferences which may support the opposing party's position.") (quoting *Q.E.R., Inc. v. Hickerson*, 880 F.2d 1178, 1180 (10th Cir. 1989) (per curiam)).

8

## A. The "Exercise Care" Duty

This is an action for failure to procure insurance, not an action for breach of the insurance contract itself. Kansas courts refer to insurance agents' "exercise care duty" in such circumstances. *Marshel Invs., Inc. v. Cohen*, 634 P.2d 133, 141 (Kan. Ct. App. 1981). Under Kansas law, the general rule is that "an insurance agent or broker who undertakes to procure insurance for another owes to the client the duty to exercise the skill, care and diligence that would be exercised by a reasonably prudent and competent insurance agent or broker acting under the same circumstances." *Id.* An action for breach of this duty sounds in both contract and tort because "the duty is both an implied contractual term of the undertaking (contract duty) and a part of the fiduciary duty owed the client by reason of the principal-agent relationship arising out of the undertaking (tort duty)." *Id.* at 142.

On appeal, Woolman argues that, although his breach-of-duty counterclaim sounds in both tort and contract, the district court "ignored the contractual nature" of the claim. Appellant's Opening Br. at 18. Woolman misreads the court's analysis. The court expressly rejected Woolman's contract theory, reasoning that Liberty Mutual didn't undertake to procure insurance for Woolman as its client or to make the insurance contract for his benefit. That the court referenced a "negligence counterclaim," *see Liberty Mut.*, 2016 WL 5817073, at *2, doesn't vitiate its substantive contractual analysis, *cf.* Appellant's Opening Br. at 18 (arguing that the reference "demonstrates the [court's] misapplication of the claim").

9

Woolman also contends that the district court "invaded the province of the jury" when it determined, as a matter of law, that Liberty Mutual didn't owe him a duty sounding in contract. Appellant's Opening Br. at 18. In his view, the jury was "capable and required" to make that determination because the existence of a contract duty entails a factual inquiry into whether the parties formed an agreement to procure insurance. *Id.* Woolman is doubly wrong. In the first instance, "whether a duty exists is a question of law" for the court to decide. *Deal v. Bowman*, 188 P.3d 941, 946 (Kan. 2008) (brackets omitted) (quoting *Nero v. Kan. State Univ.*, 861 P.2d 768, 772 (Kan. 1993)). Even if the jury made a predicate factual finding that a contract exists, whether Liberty Mutual owed Woolman a duty in connection with that contract is a question of law. And second, regardless, factual findings are not impervious to judicial scrutiny on a Rule 50 motion simply because the jury is the factfinder. To the contrary, Rule 50 requires the court to interrogate the facts to determine whether a "legally sufficient evidentiary basis" exists to find for a party on a given issue. *See* Fed. R. Civ. P. 50(a)(1).

In short, the district court didn't exceed its authority in holding, as a matter of law, that Liberty Mutual didn't owe a contractual duty to Woolman. We now turn to the substantive question whether judgment as a matter of law was appropriate as to Woolman's breach-of-duty counterclaim.

## B.    Contractual Breach

Woolman advances two contract-based theories for why Liberty Mutual owed him a duty to exercise care in procuring insurance: (i) that Liberty Mutual agreed to

procure insurance for him directly as its client; and (ii) that he was an intended third-party beneficiary of Liberty Mutual's agreement to procure insurance for Clemens Coal. The district court rejected both theories, finding no evidence either that Woolman and Liberty Mutual had a contractual relationship or that Clemens Coal and Liberty Mutual intended to procure insurance for Woolman's benefit. We take these issues in turn.

### 1. Evidence of a Direct Contractual Relationship between Liberty Mutual and Woolman

To resolve Woolman's first theory, we must determine whether a reasonable jury, viewing the evidence in the light most favorable to Woolman, could conclude that Liberty Mutual and Woolman formed a "contract to procure insurance." *See Casas v. Farmers Ins. Exch.*, 130 P.3d 1201, 1209 (Kan. Ct. App. 2005). In assessing whether such an agreement exists, we apply "the general rules pertaining to the law of contracts," *Marker v. Preferred Fire Ins. Co.*, 506 P.2d 1163, 1168 (Kan. 1973), including the requirements of mutual assent to and consideration for the bargain, *see Unified Sch. Dist. No. 446 v. Sandoval*, 286 P.3d 542, 549 (Kan. 2012). The record in this case is bereft of evidence supporting either requirement.[4]

---

[4] Because we conclude that Liberty Mutual didn't manifest its assent to procure insurance for Woolman, we needn't reach the question whether Woolman provided consideration for the bargain. In any case, Woolman doesn't proffer any evidence on that score. Ordinarily, the consideration for an agent's undertaking to procure insurance is the agent's expectation of pecuniary gain when the proposed insured pays the policy's premium. *See Marker*, 506 P.2d at 1168. Here, no evidence suggests that Woolman personally—rather than Clemens Coal—would have paid the premium for the coverage that he sought. Accordingly, even if the parties mutually assented to procure such coverage, no binding contract exists.

11

At the outset, there's no evidence that Woolman requested insurance from Liberty Mutual or that Liberty Mutual undertook to insure him. Woolman admittedly wasn't involved in negotiating the policy and didn't instruct Worley to request any coverages on his behalf. That Woolman, as Clemens Coal's president, subjectively desired coverage to indemnify himself from liability for black-lung claims doesn't evince mutual assent with Liberty Mutual to procure such coverage.[5] Indeed, there's no evidence that Liberty Mutual was even aware of Woolman's need for black-lung-claim coverage. Regardless, Clemens Coal, not Woolman, was the client for whom Liberty Mutual undertook to procure insurance.

Lacking evidence of an express agreement, Woolman asserts that Liberty Mutual implicitly agreed to procure insurance for him. In effect, he reasons that, as the individual with responsibility for Clemens Coal's actions, he was Liberty Mutual's true "client." *See id.* ("[R]easonable implication *can* be used to determine who the client is[.]"). It is hornbook law, however, that an implied-in-fact contract doesn't exist absent evidence of the parties' "mutual *intent* to contract." *Mai v. Youtsey*, 646 P.2d 475, 479 (Kan. 1982); *see also Smith v. Amoco Prod. Co.*, 31 P.3d 255, 265 (Kan. 2001) ("[An implied contract] is the product of agreement, although it

---

[5] Woolman suggests that an agreement to procure insurance for him requires only that he "selected and relied upon Liberty Mutual." *See* Appellant's Reply Br. at 2. Although probative of his estoppel defenses, Woolman's reliance is irrelevant to the question whether he and Liberty Mutual had a binding contract to procure insurance. As with any contract, parties to an agreement to procure insurance must mutually assent to its terms. Unilateral reliance doesn't create a contract.

12

is not expressed in words."). Liberty Mutual's intent to contract with Clemens Coal doesn't equate to an intent to contract with its officers.

Perhaps recognizing this, Woolman suggests that his status as the "client" is irrelevant to whether Liberty Mutual owed him a duty to exercise care. *See* Appellant's Opening Br. at 23. Woolman essentially argues that the duty attaches regardless of whether Liberty Mutual contracted to procure insurance for him because Liberty Mutual *should have* undertaken to insure him.[6] Yet Kansas law is clear: an insurance agent "owes to the *client*" the duty to exercise care. *Marshel*, 634 P.2d at 141 (emphasis added); *see also Marker*, 506 P.2d at 1169 (noting that a failure to procure insurance requires that "the relationship of broker and client has been established with mutual obligations arising from that relationship"). Absent evidence of an agent-client relationship, Liberty Mutual wasn't contractually bound to procure insurance for Woolman.

### 2. Evidence that Clemens Coal and Liberty Mutual Intended to Procure Insurance for Woolman's Benefit

Woolman's assertion that he is an intended beneficiary of Liberty Mutual and Clemens Coal's agreement to procure insurance similarly fails. Under Kansas law, "parties are presumed to contract for themselves, and their intent that a third person

---

[6] Woolman further elaborates that, had Liberty Mutual procured the proper insurance, the policy "would have made Woolman a party as an insured under the black lung endorsement." *See* Appellant's Opening Br. at 23. This puts the cart before the horse. Whether Woolman would have been a party to a hypothetical insurance contract has no bearing on whether he was a party to an agreement to procure such insurance. And regardless, an insured party isn't necessarily a contracting party.

13

receive a direct benefit must be clearly expressed in the contract." *Byers v. Snyder*, 237 P.3d 1258, 1265 (Kan. Ct. App. 2010); *see also In re Shevling*, 97 P.3d 1036, 1040 (Kan. 2004) (same). An individual claiming third-party-beneficiary status has the burden of showing the existence of a "provision in the contract that operates to his benefit." *State ex rel. Stovall v. Reliance Ins. Co.*, 107 P.3d 1219, 1231 (Kan. 2005) (quoting *Hartford Fire Ins. Co. v. W. Fire Ins. Co.*, 597 P.2d 622, 632 (Kan. 1979)). A reviewing court, in turn, applies "general rules for construction of contracts" in assessing a third-party-beneficiary claim. *Byers*, 237 P.3d at 1265.

Woolman doesn't allege that Liberty Mutual and Clemens Coal had a written contract to procure insurance for his benefit. Rather, he asserts that they had an oral agreement, an implicit condition of which was that Liberty Mutual procure coverage to indemnify him from liability for black-lung-benefits claims. Woolman thus inverts the ordinary standard of proof for third-party-beneficiary claims: rather than identify an express contractual provision that operates to his direct benefit, he contends that the agreement to procure insurance for Clemens Coal implicitly guaranteed that the policy *would* contain such a provision.[7] Kansas law, however, doesn't permit a third party to enforce a contract on an unspoken promise of future beneficence. Instead, the contract itself must *explicitly and directly* benefit the third party. *See Fasse v. Lower Heating & Air Conditioning, Inc.*, 736 P.2d 930, 932 (Kan. 1987).

---

[7] Woolman faults the district court for ignoring the distinction between the contract to procure insurance and the insurance policy itself. Yet the distinction is one without a material difference. Woolman adduced no evidence at trial that *any* agreement "clearly expressed" an intent to benefit him. *Cf. Fasse*, 736 P.2d at 932.

Regardless, even assuming Woolman could enforce an implicit agreement to procure insurance for his benefit, there's no evidence that the parties reached such an agreement. "[L]ess strict proof is required for an oral agreement to procure insurance than for a contract of insurance." *Marshel*, 634 P.2d at 142. Indeed, evidence that the parties expressly assented to all the agreement's terms is unnecessary, as many terms can be established by "[r]easonable implication." *Id.* An implied contract to procure insurance, however, requires that the client provide "sufficiently definite directions" for the agent to "consummate the final insurance contract" and that the agent "know or have ready access to the information needed to procure the insurance or be able to imply the terms from prior dealings." *See Casas*, 130 P.3d at 1210 (quoting *Harris v. Albrecht*, 86 P.3d 728, 731, 732 (Utah 2004)).

Woolman doesn't seriously contend that either he or Worley gave Smith "sufficiently definite directions" with respect to the need to insure him against black-lung claims. To the contrary, Woolman testified at trial that he wasn't involved in the transaction and that he didn't instruct Worley to obtain any specific coverages from Smith. Worley, in turn, testified that he didn't request black-lung coverage because he "assumed" it would be included. It is of no moment that Woolman and Worley's "intent" was to procure insurance that would benefit Woolman, *see* Appellant's Opening Br. at 13 (citing Appellant's App. vol. 5 at 795:18–796:3, 801:5–6; *id.* vol. 6 at 964:7–12), because they never communicated that intent to Smith.

Similarly, there's no evidence that Smith knew the "information needed to procure" black-lung-claim coverage. *See Casas*, 130 P.3d at 1210. At trial, Smith

15

testified that she'd never sold insurance to a coal company and that she wasn't aware of either the Act or black-lung disease when she sold the policy to Clemens Coal. Woolman replies on appeal that Smith must have been "well-apprised" of Clemens Coal's coverage needs because Liberty Mutual specifically targeted the coal industry. Opening Br. at 51. Woolman's only evidence for this assertion is a Liberty Mutual proforma in which Clemens Coal is listed as a "Prospect" and a box is checked for "Target Market." Appellant's App. vol. 7 at 1113. Yet an isolated checkmark, devoid of substantive elaboration, reveals nothing about Smith's or Liberty Mutual's knowledge of black-lung-claim coverage. And regardless, Smith testified that the checkmark was likely inadvertent and may not have reflected an actual campaign to target coal companies.

Woolman nevertheless argues that, by soliciting business from a "known coal company," Liberty Mutual contemplated that the contract to procure insurance would "incorporate[] the 'well-known' standards" associated with such companies. Appellant's Opening Br. at 22 (quoting *Marshel*, 634 P.2d at 141). Woolman asserts that coverage shielding a coal company's president from liability for black-lung-disease benefits is a "well-known" standard because the Act has for decades imposed personal liability for such benefits. Appellant's Opening Br. at 22. Smith, however, wasn't aware of this purported standard because she had no experience selling insurance to a coal company. An agent contemplates the incorporation of standards

16

that are known within the agent's "field of expertise," *Marshel*, 634 P.2d at 142, not standards about which the agent has no knowledge.[8]

Finally, there's no evidence that Smith had "ready access to the information needed to procure" black-lung-claim coverage. *See Casas*, 130 P.3d at 1210 (quoting *Harris*, 86 P.3d at 732). Woolman's argument to the contrary relies on an implausible chain of inferences: that Smith would have asked to review, and Worley would have tendered, Clemens Coal's expiring Hartford insurance policy; that the Hartford policy, according to the IMA broker who procured it, would have contained a black-lung-claim endorsement; and that Smith, following her "standard" procedure, would have duplicated that endorsement. *See* Appellant's Opening Br. at 21–22 (quoting Appellant's App. vol. 5 at 584:16–585:12, 587:1–5). The evidence adduced at trial doesn't support these inferences. Worley didn't recall sharing the Hartford policy, and Smith didn't recall receiving it; insufficient portions of the policy were produced to confirm its black-lung-claim coverage, and Hartford previously questioned such coverage; and Smith testified that duplicating an expiring policy was just one of many ways that she determined coverage. It is unreasonable to infer from this evidence that Worley shared, and Smith duplicated, an insurance policy with black-

---

[8] Woolman insists that the contract to procure insurance must have incorporated well-known standards because his and Worley's "intent was to be in compliance with the law in procuring insurance." Appellant's Opening Br. at 22. But such subjective intent doesn't somehow impute to Smith any knowledge of a standard requiring insurance for a coal company's president—much less a reciprocal intent to benefit the president.

lung-claim coverage—regardless of what the parties purportedly *would have* done and what the Hartford policy *would have* contained.

Nonetheless, even assuming Smith followed her standard procedure and undertook to replicate the Hartford policy's black-lung endorsement, that undertaking suggests only that Smith intended to provide the same coverages that Clemens Coal enjoyed with its prior carrier, not that Smith intended to benefit Woolman personally. Woolman counters that, by undertaking to procure a black-lung endorsement, Smith necessarily intended to directly benefit him "by eliminating his personal liability" for black-lung claims. Appellant's Reply Br. at 9.[9] According to Woolman, it is sufficient that he would be an "identifiable beneficiary" of the endorsement. *Id.*[10] Yet just because the endorsement would operate to Woolman's benefit doesn't mean that Smith *intended* to benefit Woolman. At most, the benefit would be incidental to and

---

[9] Woolman stresses that the generic black-lung endorsement, set forth in 20 C.F.R. § 726.203(a), references the Act's personal-liability provisions, including those applicable to a coal company's president, *see, e.g.*, 30 U.S.C. § 933(d). At most, this reference alerts the contracting parties that the black-lung endorsement would shield the president from personal liability. But "[k]nowledge that a contract will benefit a third party is not *intent* to benefit the third party." *Noller v. GMC Truck & Coach Div.*, 772 P.2d 271, 275 (Kan. 1989).

[10] Woolman goes so far as to suggest that, because the purpose of insurance is to "minimize a risk," *anyone* "who would realize the mitigation or elimination of the risk" is an insurance policy's intended beneficiary. Appellant's Reply Br. at 8. This argument ignores the "intent" requirement entirely, enshrining a *per se* rule that would bestow third-party-beneficiary status on anyone whose risk an insurance contract happens to mitigate. A third-party beneficiary, however, is "one who the contracting parties intended should receive a direct benefit from the contract," *see Martin v. Edwards*, 548 P.2d 779, 784–85 (Kan. 1976), not one who happens to benefit from the contract, *see In re Shevling*, 97 P.3d at 1040.

18

not the direct object of the endorsement, the primary purpose of which is to insure miners who contract black-lung disease.

In short, there's no evidence that the parties intended—impliedly or otherwise—to procure black-lung-claim insurance for Woolman's direct benefit. Clemens Coal didn't give Liberty Mutual any directions regarding a need to procure such coverage, and Liberty Mutual didn't already know of or have access to the information needed to procure it. Even Woolman's "standard procedure" chain of inferences suggests, at most, that Liberty Mutual intended to procure black-lung-claim coverage for Clemens Coal as a company. Although Liberty Mutual may have owed Clemens Coal a duty to "exercise care" in that undertaking, it doesn't follow that it owed a separate duty to Woolman in his personal capacity.

## C. Tortious Breach

Woolman devotes much of his time fighting an uphill battle on the breach-of-contract front while leaving his tort theory relatively underdeveloped. His argument that Liberty Mutual owed him a duty sounding in tort reduces to the proposition that, as Clemens Coal's president, he is a foreseeable plaintiff because the Act makes him personally liable for uninsured black-lung benefits. He further contends that the probability of harm—*i.e.*, that he would be held personally liable—is foreseeable because "the risk is delineated by law[] and claims for black lung disease are common among coal companies." Appellant's Reply Br. at 10.

This analysis misses the point. Regardless of whether Woolman is a foreseeable plaintiff under an ordinary negligence analysis, his foreseeability, alone,

19

doesn't give rise to a duty to exercise care in procuring insurance. The Court of Appeals of Kansas explained in *Marshel* that the duty arises in tort as "part of the fiduciary duty owed the client by reason of the principal-agent relationship arising out of the undertaking" to procure insurance. 634 P.2d at 142. The Court of Appeals has since read *Marshel* as holding that "a tort duty only arises when there is a contractual undertaking by the agent" for the client. *Duncan v. Janosik, Inc.*, 203 P.3d 88 (Kan. Ct. App. 2009) (unpublished table decision). As a result, "when there is no contract duty between the agent and client, . . . there is no basis from which a tort duty may arise." *Id.* Our conclusion that Liberty Mutual didn't owe Woolman a contract duty thus forecloses the possibility that it owed him a duty sounding in tort.

## II.     The Judicial Estoppel Doctrine

In a last-ditch attempt to salvage his breach-of-duty counterclaim, Woolman asserts that Liberty Mutual should be judicially estopped from disputing that it owed him a duty because it took inconsistent positions on the issue in the district court and obtained an unfair advantage as a result. Woolman initially asserted judicial estoppel in his post-trial motion to alter or amend the district court's judgment. Because Woolman could have, but did not, raise the issue before judgment, the district court declined to alter or amend its judgment on that basis. On appeal, Woolman argues that this decision "resulted in manifest injustice and was clear error." Appellant's Opening Br. at 29.

Judicial estoppel "is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (quoting *Russell v. Rolfs*, 893

20

F.2d 1033, 1037 (9th Cir. 1990)). We therefore review the district court's judicial-estoppel decision for abuse of discretion. *Bradford v. Wiggins*, 516 F.3d 1189, 1193 (10th Cir. 2008). "A court abuses its discretion only 'when it makes a clear error of judgment, exceeds the bounds of permissible choice, or when its decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment.'" *Eastman v. Union Pac. R.R.*, 493 F.3d 1151, 1156 (10th Cir. 2007) (quoting *United States v. Nickl*, 427 F.3d 1286, 1300 (10th Cir. 2005)).

The judicial-estoppel doctrine's purpose is to "prevent improper use of judicial machinery" by parties attempting to "deliberately chang[e] positions according to the exigencies of the moment." *Queen v. TA Operating, LLC*, 734 F.3d 1081, 1087 (10th Cir. 2013) (quoting *New Hampshire*, 532 U.S. at 749–50). The doctrine's applicability generally turns on whether a party's later position is "clearly inconsistent" with its former position; whether the party successfully persuaded the court to accept its previous position, such that the court's later acceptance of an inconsistent position would "create 'the perception that either the first or the second court was misled'"; and whether the party would derive an unfair advantage unless estopped. *New Hampshire*, 532 U.S. at 750–51 (internal quotation marks omitted) (first quoting *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999); then quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982)). The analysis is ultimately fact-specific, however, and requires no "inflexible prerequisites." *Id.* at 751.

Woolman argues that judicial estoppel is warranted in this case for three primary reasons. He asserts, first, that Liberty Mutual waived its right to dispute that it owed him a duty when it admitted in its answer to his counterclaim that he was the "real party in interest" to the claim. Appellant's Opening Br. at 29–30. Second, he contends that Liberty Mutual took "contrary position[s]" on whether it owed him a duty and on whether he must prove a duty independent of Liberty Mutual's obligations to Clemens Coal. *Id.* at 30. And third, he contends that Liberty Mutual gained an "unfair advantage" by neglecting to contest the existence of a duty until late in the litigation. Appellant's Reply Br. at 14. All three arguments fail.

First, Liberty Mutual's admission that Woolman is the real party in interest to assert the breach-of-duty counterclaim has no bearing on the claim's merits. The real party in interest is simply "the person who possesses the right sought to be enforced." *O'Donnell v. Fletcher*, 681 P.2d 1074, 1076 (Kan. Ct. App. 1984). An entitlement to enforce a right, however, "neither enlarges nor restricts a party's substantive right to recover in a particular action." *Id.* at 1077. Hence, even if Woolman is the "real party in interest" to the counterclaim, he still must demonstrate a substantive right to recover on the claim, including by proving that Liberty Mutual owed him a duty. Liberty Mutual didn't somehow waive that obligation.[11]

---

[11] Woolman adds that Liberty Mutual failed to timely raise, and thus waived, any "objection based on [an] alleged failure to have the action prosecuted in the name of the real party in interest." Appellant's Opening Br. at 30 (quoting *O'Donnell*, 681 P.2d at 1077). This is a strawman, because Liberty Mutual doesn't purport to raise such an objection. Liberty Mutual disputes that it owed Woolman a duty, not that

22

Second, Liberty Mutual never took a contrary position on the existence of a duty. Woolman argues that Liberty Mutual initially "assumed" it owed him a duty, Appellant's Opening Br. at 31, citing Liberty Mutual's assertion in the pretrial order that it "did not breach any assumed duty to Woolman in the issuance of the Liberty Mutual Policy," Appellant's App. vol. 1 at 96. Yet "assumed," in this context, is an adjective meaning "not true" or "supposed." It is not, as Woolman suggests, a transitive verb denoting an "acceptance" or "undertaking" of a position. That is, Liberty Mutual didn't accept that it owed Woolman a duty but rather asserted that it didn't breach a nonexistent duty to him. Liberty Mutual's later position that it didn't owe Woolman a duty isn't inconsistent with this earlier position. *See New Hampshire*, 532 U.S. at 750.[12]

Liberty Mutual also never took a contrary position on whether Woolman must prove that it owed him a duty independent of any duty that it owed to Clemens Coal. Woolman stresses that Liberty Mutual didn't make the argument that he must prove an independent duty until after the close of his case-in-chief. That Liberty Mutual waited to raise the argument, however, doesn't mean it ever adopted a contrary

---

Woolman has the capacity to assert the breach-of-duty counterclaim. Woolman conflates these distinct concepts.

[12] As further evidence that Liberty Mutual initially admitted it owed him duty, Woolman notes that Liberty Mutual failed to assert absence of a duty "as a defense" in the pretrial order. Appellant's Opening Br. at 31. He emphasizes that Liberty Mutual asserted a defense to the breach element of his counterclaim but didn't specifically contest the duty element. Yet Liberty Mutual's silence on the duty element isn't an admission as to that element, much less a "clearly inconsistent" position.

23

position. Indeed, Woolman's only evidence of inconsistency is that Liberty Mutual didn't raise the independent-duty argument in its summary judgment briefing but instead focused solely on whether it breached a duty to Clemens Coal. Yet Liberty Mutual's *omission* of the argument doesn't constitute an *affirmative position* to the contrary. *Cf.* Appellant's Reply Br. at 14 (reading the omission as Liberty Mutual taking the view that "Woolman need not prove a duty independent of that owed to Clemens Coal").[13]

Third, and last, Liberty Mutual didn't obtain an "unfair advantage" by failing to contest that it owed Woolman a duty until its motion for judgment as a matter of law. *See New Hampshire*, 532 U.S. at 751. Woolman reasons that he "had no expectation [duty] was an issue to be tried," because Liberty Mutual didn't dispute that it owed him a duty in its answer, in the pretrial order, or in its summary-judgment briefing. Appellant's Opening Br. at 30. This is tantamount to arguing that a party needn't prove an element of its claim unless the other party disputes it. Yet Woolman had the burden of proving that a legal duty existed as part of his prima facie case, regardless of whether Liberty Mutual raised the issue. Accordingly, Liberty Mutual's initial failure to contest the issue didn't prejudice Woolman.

Woolman's evidence, in brief, falls short of demonstrating entitlement to judicial estoppel—much less that the district court abused its discretion in refusing to

---

[13] Because Liberty Mutual didn't espouse inconsistent positions on the independent-duty question, we needn't address whether Liberty Mutual persuaded the district court to adopt an earlier, contrary position.

estop Liberty Mutual from contesting that it owed Woolman a duty. We therefore decline to disturb the district court's judgment.

## III.    Woolman's Estoppel Defenses

Woolman advances several arguments in support of his entitlement to equitable and promissory estoppel. As a threshold issue, he contends that the district court erred in declining to submit to the jury a series of interrogatories that related to his estoppel defenses. He then argues that the district court, in resolving his estoppel defenses, failed to bind itself to factual findings implicit in the jury's verdict in the counterclaim trial. Next, he asserts that the district court misapplied the law to his estoppel defenses. And finally, he contends that the district court erred in failing to use estoppel to expand the Liberty Mutual policy's coverages beyond its terms.

### A.    The Special Interrogatories

Before trial, Woolman asked the district court to submit his estoppel defenses to the jury as well as several special interrogatories regarding the defenses. The court denied both requests, and instead limited the trial to the breach-of-duty counterclaim. On appeal, Woolman contends that the court erred in thus limiting the trial and that, instead, it should have asked the jury to make factual findings that would have controlled the court's resolution of the estoppel defenses. He avers that the absence of such explicit guidance from the jury's interrogatory answers resulted in the court making findings in its estoppel ruling that were contrary to findings *implicit* in the jury's verdict.

25

We review de novo whether, "as a whole, the district court's jury instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." *Martinez v. Caterpillar, Inc.*, 572 F.3d 1129, 1132 (10th Cir. 2009) (quoting *World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1139 (10th Cir. 2006)). But we review a decision whether to give a particular instruction only for abuse of discretion. *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1248 (10th Cir. 1998). If the instructions "as a whole adequately state[] the law, the refusal to give a particular requested instruction is not an abuse of discretion." *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990).

Here, the jury instructions as a whole adequately stated the governing law regarding Kansas' exercise-care duty. The district court didn't abuse its discretion in declining to further instruct the jury about defenses not at issue in the trial. The court specifically bifurcated the litigation, submitting Woolman's legal counterclaim to the jury while reserving for itself resolution of Woolman's equitable defenses. Given this bifurcation, an instruction on equitable defenses not at issue in the jury trial risked misleading the jury in its "understanding of the issues and law applicable to the case before it." *United States v. Laughlin*, 26 F.3d 1523, 1528 (10th Cir. 1994). The court properly declined to obfuscate the issues in this manner.[14]

---

[14] To the extent Woolman challenges the district court's refusal to submit the estoppel defenses to the jury, that argument also fails. "Entitlement to a jury trial is a question of law which we review de novo." *Bowdry v. United Airlines, Inc.*, 58 F.3d 1483, 1489 (10th Cir. 1995). Unless a statute speaks to a jury-trial right, we look to

26

## B.    The Jury's "Implicit Findings"

Woolman stakes much of his estoppel argument on the assertion that the district court, in ruling on his estoppel defenses, erred in failing to bind itself to the "implicit findings" that the jury made regarding his breach-of-duty counterclaim and in failing to consider "alternative factual findings" that the jury could have made to support its verdict. *See* Appellant's Opening Br. at 34. Woolman insists that when, as here, legal and equitable claims are "commingled," the Seventh Amendment prohibits a court from "reaching factual conclusions contrary to those explicitly or implicitly reached by the jury." *Id.* at 33. Liberty Mutual counters that a court must bind itself only to the jury's findings on "common questions of fact" and argues that, in this case, no common factual issues bound the court. Appellee's Br. at 26–27 (quoting *Colo. Visionary Acad. v. Medtronic, Inc.*, 397 F.3d 867, 875 (10th Cir. 2005)).

In an appeal from a bench trial, we review the district court's factual findings for clear error. *Keys Youth Servs., Inc. v. City of Olathe*, 248 F.3d 1267, 1274 (10th Cir. 2001). Where the case also involves a jury trial, we must "take into account the binding effect" on the trial court of the jury's findings as to issues of fact common to both the legal and the equitable claims. *Smith v. Diffee Ford–Lincoln–Mercury, Inc.*,

---

the Seventh Amendment to determine entitlement to a jury trial. *See Tull v. United States*, 481 U.S. 412, 417 & n.3 (1987). Though the Seventh Amendment guarantees the right to a jury trial in any suit involving "legal rights," this guarantee doesn't extend to "equitable rights." *Bowdry*, 58 F.3d at 1489. Hence, Woolman had no entitlement to a jury trial on his equitable defenses.

298 F.3d 955, 965 (10th Cir. 2002). This ensures that litigants' Seventh Amendment jury-trial rights aren't rendered meaningless on such common factual issues. *See id.* (quoting *Ag Servs. of Am. v. Nielsen*, 231 F.3d 726, 730 (10th Cir. 2000)). The jury's findings, however, bind the court only to the extent that "fact issues central to a claim are decided by a jury upon evidence that would justify its conclusion." *Brinkman v. Dep't of Corrections*, 21 F.3d 370, 372–73 (10th Cir. 1994).

Here, the parties' protracted focus on the jury's implicit findings is largely academic, because no factual findings bound the district court in its disposition of Woolman's estoppel defenses. Our previous discussion makes clear that the jury's verdict for Woolman on his counterclaim lacked competent "evidence that would justify its conclusion." *See id.* at 372. And regardless, before issuing its estoppel decision, the district court granted Liberty Mutual's motion for judgment as a matter of law and set aside the verdict—thus nullifying any factual findings explicit or implicit in the verdict. *See* Appellant's App. vol. 2 at 340 ("The court sets aside the jury's verdict and award . . . ."). The jury's factual findings, of course, couldn't constrain the court if the verdict wasn't intact. *Cf. Nielsen*, 231 F.3d at 731 (concluding that, because the trial court "left intact the jury's verdict and its explicit findings and those necessarily implicit from the verdict," those findings bound the court).

Because the district court properly set aside the verdict as contrary to the evidence under Federal Rule of Civil Procedure 50, we needn't inquire further whether the court made factual findings inconsistent with the jury's implicit

28

findings.[15] We therefore turn to the court's substantive analysis of Woolman's estoppel defenses.

## C.    The Substantive Law of Estoppel

Woolman protests the district court's purported misapplication of the law in disposing of his equitable- and promissory-estoppel defenses. In an appeal from a bench trial, we review the district court's conclusions of law de novo. *Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist.*, 226 F.3d 1170, 1177–78 (10th Cir. 2000). We continue to review the court's factual findings for clear error. *Id.* at 1177.

A party asserting equitable estoppel must show that another party, "by its acts, representations, admissions, or silence when it had a duty to speak, induced [the first party] to believe certain facts existed," and also that the first party "rightfully relied

_____

[15] Woolman would have us conclude that the jury made a series of findings in reaching its verdict, but as Woolman recites them, these findings are implausible and ignore mountains of evidence to the contrary. According to Woolman, the findings include that Worley gave Smith a copy of the Hartford policy; that the policy contained a black-lung endorsement; that Smith followed her "standard" procedure to copy the endorsement; and that Clemens Coal didn't have actual notice that the Liberty Mutual policy differed in its coverages from policies offered through IMA. None of these findings have a reasonable basis in the record—and thus, the jury couldn't have implied them in its verdict.

Woolman's misguided analysis relies on the flawed notion that the jury *could not* have reached its verdict without implying these findings. But a simpler rationale for the verdict accords with the weight of the evidence and doesn't rely on a complex web of unlikely implicit findings: in determining that Liberty Mutual breached a duty to Woolman, the jury concluded that Liberty Mutual negligently failed to familiarize itself with and procure the "proper coverage" that coal companies like Clemens Coal require. This rationale is entirely consistent with the district court's resolution of Woolman's estoppel defenses.

and acted upon such belief." *Mut. Life Ins. Co. of N.Y. v. Bernasek*, 682 P.2d 667, 730 (Kan. 1984) (quoting *Cosgrove v. Young*, 642 P.2d 75, 84 (Kan. 1982)). Equitable estoppel therefore "has two fundamental elements: misrepresentation and detrimental reliance." *United Cities Gas Co. v. Brock Expl. Co.*, 995 F. Supp. 1284, 1297 (D. Kan. 1998). Promissory estoppel similarly requires a representation inducing reliance; the difference being that, for promissory estoppel, "the representation is promissory rather than to an existing fact." *Marker*, 506 P.2d at 1170.[16]

Here, the district court found no evidence that Liberty Mutual represented or promised to procure black-lung coverage. To prove the representation element, Woolman falls back on the jury's "implicit finding[]" that Smith "promise[d] to duplicate Clemens Coal's previous coverage in conformity with her standard procedure." Appellant's Opening Br. at 43. Our rejection of the "implicit findings" thesis above predetermines our rejection of it here. *See* discussion, *supra* Section III.B. Furthermore, even drawing all reasonable inferences in Woolman's favor, there's no evidence that Smith promised to duplicate coverages or that she even informed Worley that her "standard" procedure involved duplication. Nevertheless, even if Smith promised to duplicate the Hartford policy's coverages, there's no evidence that she promised to duplicate *black-lung* coverage. The suggestion that Smith made such a promise presupposes that she received a copy of the Hartford

---

[16] The promissory "representation" also needn't be a "misrepresentation." *See Bouton v. Byers*, 321 P.3d 780, 792 (Kan. Ct. App. 2014) (clarifying this distinction).

policy and that the policy had black-lung coverage to duplicate—two facts with no basis in the record.

Lacking evidence of a promise to duplicate coverage, Woolman argues that Smith "had a duty to inform Clemens Coal if she could not duplicate coverage" and that Smith's *silence* in the face of that duty induced Clemens Coal to believe that she undertook to duplicate coverage. Appellant's Opening Br. at 43. This inverts the analysis. Absent evidence that Clemens Coal asked Smith to duplicate coverage or that Smith promised to do so, Smith's "silence" represented nothing. Clemens Coal couldn't construe such silence as a promise that Smith would duplicate coverage if there was no baseline expectation that Smith *would* duplicate coverage. Accordingly, Smith had no "duty" to inform Clemens Coal that she couldn't duplicate coverage. The necessary predicate to an obligation to correct an earlier representation is, after all, the existence of an earlier representation. Woolman's estoppel defenses fail on the first element. *See Ram Co. v. Estate of Kobbeman*, 696 P.2d 936, 944 (Kan. 1985) (stating that an estoppel claim fails if any essential element "is lacking or is not satisfactorily proved") (quoting 28 Am. Jur. 2d *Estoppel & Waiver* §§ 35–36 (1964)).

Assuming Woolman could prove that Smith promised to duplicate coverage, he nevertheless fails to show that he reasonably relied on that promise. The district court found that any reliance wasn't reasonable, in part, because Woolman failed to read the insurance policy, which unambiguously excluded coverage for black-lung claims. On appeal, Woolman doesn't dispute that he didn't read the policy but asserts that he had a duty to read only the "*application* for insurance." Appellant's Opening

31

Br. at 44. He contends that "an insured has a right to assume the policy provides the coverage requested—here, the same coverages as The Hartford policy . . . ." *Id.* Yet Woolman doesn't even claim that he read the insurance application. Any purported distinction between the policy and the application is thus immaterial, because Woolman cannot credibly claim reliance on either document. *See Chism v. Protective Life Ins. Co.*, 234 P.3d 780, 792 (Kan. 2010) (duty to read application); *Jones v. Reliable Sec. Incorporation, Inc.*, 28 P.3d 1051, 1062 (Kan. Ct. App. 2001) (duty to read policy).

Regardless, the parties failed to produce the application at trial and could only speculate about its contents.[17] At most, Worley—the individual who submitted the application—testified that he *would not have* requested black-lung coverage because he "assumed" that it would be included.[18] Yet, even if Worley did request black-lung coverage, it was still unreasonable for Woolman to assume that the resulting policy conformed to Worley's request. As the district court noted, at $43,000 cheaper than comparable policies offered through IMA, the policy's bargain-bin price tag was a red flag that should have prompted further inquiry into the policy's coverages. IMA's account representative for Clemens Coal even testified that he "absolutely" would have advised Clemens Coal to investigate the price discrepancy. Yet no one

---

[17] Woolman's reliance on the jury's "implicit findings" to supply the application's missing terms is no more enlightening here than with the policy itself.

[18] To the extent Woolman argues that Worley requested black-lung coverage by tendering, and asking Smith to duplicate, a prior policy with black-lung coverage, there's no evidence for either proposition.

32

investigated further, and instead Clemens Coal selected the policy *because* it was cheaper than the alternatives. This willful blindness to the policy's coverages vitiates the reasonableness of any reliance.

In short, the district court correctly rejected Woolman's estoppel defenses because there's no evidence either that Liberty Mutual represented it would procure black-lung coverage or that Woolman reasonably relied on such a representation.[19] We see no clear error in the district court's factual findings, and our de novo review of the court's legal analysis compels the same result.

## D.     Expansion of Coverage

The parties stipulated before trial that the Liberty Mutual policy excludes coverage for black-lung-disease claims. Woolman urged the district court to use an estoppel theory to expand the policy's terms to cover such claims, but the district court found no compelling reason to expand coverage in this case. Woolman now embarks on a protracted critique of the district court's refusal to expand coverage.

---

[19] Having found that Woolman's estoppel defenses failed on the representation and reliance elements, the district court had no occasion to determine whether justice required it to enforce a promise. On appeal, Woolman nevertheless urges us to estop Liberty Mutual from denying black-lung coverage because it would be "substantially unjust" to empower an insurance company to "deny coverage that a jury determined should have been provided," thereby exposing him to personal liability for Spencer's black-lung claim. Appellant's Opening Br. at 47. Yet Woolman's success on his breach-of-duty claim doesn't automatically entitle him to relief on his estoppel defenses, especially where, as here, the jury's determination lacked a legally sufficient evidentiary basis. Nor does substantial injustice automatically flow from the risk of incurring liability. The absurd implication of Woolman's entreaty is that "injustice" would befall every litigant who happens to be sued. We decline to sanction such a theory.

Kansas recognizes the general rule that estoppel "cannot be used to expand . . . coverage" beyond an insurance contract's terms. *W. Food Prods. Co. v. United States Fire Ins. Co.*, 699 P.2d 579, 584 (Kan. Ct. App. 1985). Courts eschew this practice because it risks "creating coverage where none has been contracted for." *Aselco, Inc. v. Hartford Ins. Grp.*, 21 P.3d 1011, 1020 (Kan. Ct. App. 2001) (quoting *Johnson v. Studyvin*, 828 F. Supp. 877, 886 (D. Kan. 1993)). Nonetheless, the Supreme Court of Kansas has, on one occasion, affirmed a court's use of estoppel to expand coverage. *Heinson v. Porter*, 772 P.2d 778, 783 (Kan. 1989), *overruled on other grounds by Glenn v. Fleming*, 799 P.2d 79, 81 (Kan. 1990). Although the court in *Heinson* applied a multi-factor, totality-of-the-circumstances test,[20] a panel of the Court of Appeals of Kansas has since read the decision as sanctioning expansion of coverage only when there are affirmative representations and acts of coverage and when the policy doesn't "explicitly exclude the incident at issue." *See Russell v. Farmers Ins. Co.*, 163 P.3d 1266, 1269 (Kan. Ct. App. 2007).

---

[20] In *Heinson*, a homeowner's insurance policy excluded coverage for injuries or damages arising out of "business pursuits." 772 P.2d at 779–80. The insured operated a day care out of her home when a child under her care sustained severe injuries. Though the Supreme Court of Kansas concluded that the day care was a "business pursuit," it nonetheless held that the insurer was estopped from denying coverage for the child's injuries. The court cited several facts for this holding, including that the insurer knew the insured was operating a day-care business out of her home; that the insurer's agent told the insured that the policy would cover the business; that the insured's application for insurance disclosed that she operated the business; that the insurer didn't express any concern over the business to the insured; and that the insurance policy didn't expressly exclude day-care activity. *See id.* at 783.

The district court in this case, relying on *Russell*, found it dispositive that Liberty Mutual made no affirmative representations or acts as to black-lung-claim coverage and that the resulting policy explicitly excluded coverage for such claims. Woolman protests that the court erred in giving dispositive weight to these two factors, arguing that, under *Heinson*'s totality-of-the-circumstances test, "no factor, or two, is dispositive." Appellant's Reply Br. at 22. Yet many of the circumstances that Woolman faults the district court for ignoring are untethered to the record. These include the chain of inferences about Smith using her "standard" procedure to duplicate coverages, as well as the assertion that Liberty Mutual knew of Clemens Coal's insurance needs because it was "targeting" the coal industry. Appellant's Opening Br. at 51. Though *Heinson* counsels a multi-factor analysis, it doesn't compel any consideration of factors that contradict the evidence.

In any case, it defies logic to use an estoppel theory to expand coverage by considering all circumstances *except* the touchstone element of an estoppel claim: a representation inducing reliance. We hesitate to create by judicial fiat an obligation that an insurer never induced an insured to believe existed. Similarly, that the policy explicitly excluded the disputed coverage, and that the insured acquiesced to the exclusion by purchasing the policy, strongly counsels against expanding coverage beyond the agreed terms. Even if these two factors—representation and exclusion—

35

aren't dispositive, they warrant substantial weight in the analysis. Certainly, the district court didn't abuse its discretion in emphasizing these factors.[21]

Woolman tries to surmount this assessment by contending that public policy requires an expansion of coverage to "preserve[] the rights" to which he is entitled. Appellant's Reply Br. at 22. Woolman insists that expansion would simply "hold Liberty Mutual accountable for that which it said it would do," *i.e.*, procure black-lung coverage for his benefit. *Id.* at 23. Liberty Mutual, however, never undertook to insure Woolman directly or to procure insurance for his benefit. Accordingly, rather than preserve a preexisting right, Woolman is impermissibly attempting to acquire a new one. Public policy doesn't favor rewarding insureds who neglect to request coverage, then years later claim that the insurer wrongfully failed to procure such coverage when the risk actually materializes.

Woolman posits a second public-policy rationale for expanding coverage: that he "already possessed" a right to black-lung coverage because federal regulations require coal companies to acquire insurance with such coverage. Appellant's Opening Br. at 55. But the regulations on which Woolman relies define a *coal mine operator's* duty to obtain coverage. *See* 20 C.F.R. § 726.1 ("[T]he Federal Coal Mine Health and

---

[21] Neither party suggests a standard for our review of decisions whether to expand insurance coverage. We generally review a court's assessment of disparate, case-specific factors under the deferential abuse-of-discretion standard. *See, e.g., Mocek v. City of Albuquerque*, 813 F.3d 912, 932 (10th Cir. 2015); *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008). We need not decide the issue, however, because we would affirm the district court's assessment of the circumstances relevant to expanding coverage under even a de novo standard.

Safety Act . . . requires each coal mine operator . . . to secure the payment of [black-lung] benefits . . . ."); 30 U.S.C. § 933(a) ("[E]ach operator of a coal mine . . . shall secure the payment of benefits . . . ."); *see also* 20 C.F.R. § 726.2(a) ("[Part 726] provides rules directing and controlling the circumstances under which a coal mine operator shall fulfill his insurance obligations under the Act."). The regulations contain no similar provisions imposing an independent duty on an insurer to include black-lung coverage in every policy issued to a coal company. There are no compelling public-policy reasons to ignore the regulations' plain language and shift from the operator to the insurance company the burden to conform insurance policies to the Act.

Having considered the totality of the circumstances, we conclude that the district court didn't err in declining Woolman's extraordinary request to expand the coverages in the Liberty Mutual policy. Liberty Mutual never represented it would procure the coverage that Woolman now seeks, and the policy itself clearly excludes such coverage. No other compelling consideration justifies rewriting the agreement—twenty years later—to Woolman's liking.

## CONCLUSION

For the above reasons, we affirm the district court.